No. 88-038

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

     Plaintiff and Respondent,

-vs-

FRED DANIEL VAN DYKEN,

     Defendant and Appellant.

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Margaret L. Borg, Public Defender's Office,
Missoula, Montana; William Boggs, Missoula, Montana

     For Respondent:

          Hon. Marc Racicot, Attorney General, Helena, Montana
Elizabeth S. Baker, Asst. Attorney General, Helena
Robert L. Deschamps, III, Missoula, Montana

Submitted on Briefs:  January 4, 1990

Decided:  May 3, 1990

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Fred Van Dyken appeals the jury decision convicting him of deliberate homicide in the death of Officer Allen Kimery. At the first trial held September 9 through 21, 1985 in Park County, Montana, the jury was unable to reach a verdict after several hours of deliberation. Judge Thomas A. Olson declared a mistrial. A second trial, held June 8 through 26, 1987 in Lewis and Clark County, resulted in a conviction for deliberate homicide. We affirm the lower court's decision.

Several issues are presented for review:

1. Is defendant's conviction upon retrial barred by former jeopardy?

2. Did the District Court err in ruling that the expert witness for the defense could not testify to the defendant's version of the crime?

3. Did the District Court properly instruct the jury regarding consideration of lesser included offenses?

4. Did the District Court properly instruct the jury regarding the mental state required for conviction of deliberate homicide?

5. Did the District Court err in admitting the rebuttal testimony of the State's expert witness?

On November 30, 1984, Josie Morgan, defendant Fred Van Dyken's ex-mother-in-law, reported to the Great Falls Police Department that her black and white 1979 Chevrolet Monte Carlo had been stolen. That same evening Chris and Sandy Tigart, friends of the

defendant, reported that a .357 Charter Arms revolver, a checkbook and wallet had been stolen from their Great Falls home. Also that evening, defendant cashed a number of the Tigarts' checks at various Great Falls establishments and was seen driving a black and white Monte Carlo. During most of the evening defendant was accompanied by his friend Mike Masikka and the two spent the night drinking in area taverns. At one point the defendant told Masikka he had a .357 pistol in the car trunk and asked of Masikka if he "knew anybody [he] wanted to waste or anything."

After taking Masikka home early in the morning of December 1, the defendant drove to Missoula where he telephoned his friend Jeff Braida. Defendant then returned to Great Falls.

Detective Joseph McGuire of the Great Falls Police Department called defendant on the morning of December 5 to inform defendant he was a suspect in the burglary of the Tigart home. Later that day defendant admitted to Chris Tigart that he had stolen the items from the Tigart home and would like to return them.

In an attempt to retrieve those items, defendant drove the black and white Monte Carlo to the Lincoln area where he had discarded the items on December 1, but failed to find any of the stolen property. Defendant then continued to Missoula where he again contacted Jeff Braida. Along with Jeff's bother, Tim Braida, the three spent the evening of December 5 drinking and playing pool. During the evening defendant pulled the .357 revolver from under the seat and showed it to the Braida brothers, declaring while pointing his index finger at the window as if holding the

3

gun, "If a cop pulls me over, I'll just blow them [sic] away." Defendant drove the Braidas to their parents' home sometime after 2:00 a.m. December 6, and indicated he was going to his little brother's house.

The Braidas would later testify that they noticed nothing unusual or abnormal about defendant's behavior that evening and that he did not appear drunk nor was his driving impaired by drinking. Other witnesses who saw defendant that night and in the early morning hours of December 6 would testify similarly.

On December 6, 1984, shortly before 3:00 a.m., the attendant on duty at the SuperAmerica gas station on Brooks Street in Missoula, reported to 911 that a man in a black Chevrolet drove away without paying for gas. The 911 dispatcher broadcast the reported theft along with the car's license plate number, Montana 2-81609. Soon thereafter Missoula County Deputy Sheriff Allen Kimery radioed that he had the suspected vehicle in sight, identified it by license number, and requested the assistance of a city police officer since the incident had occurred within the city's jurisdiction.

A few minutes later a resident of the neighborhood that Deputy Kimery radioed from, called 911 to report that an officer was shot and lying in the street. Other officers were dispatched to the scene. Deputy Kimery was then transported to a nearby hospital where he died from a gunshot wound to his chest, the bullet having been fired from a distance of approximately three feet.

Officers began a city-wide search for the 1979 black and white

4

Monte Carlo. The vehicle was soon discovered in an alley in Missoula's lower Rattlesnake area, riddled with bullet holes and abandoned.

At approximately 4:00 a.m., defendant called the Braidas and asked if they would give him a ride. On their way to pick up the defendant, the Braidas stopped at the SuperAmerica station on Brooks Street for gas. Jeff put gas in the tank while Tim went to pay for it. Tim, in talking with the gas station attendant, learned of the gas theft and shooting. When he found out the car involved had Great Falls license plates, Tim decided that he and Jeff would not pick up the defendant. Tim told the SuperAmerica attendant the defendant's name and where the Braidas were to meet him. The Braida brothers then returned home.

The SuperAmerica attendant then phoned 911 to relay the information given by Tim Braida. When the defendant was located at the convenience store indicated by Tim Braida, he was arrested for carrying a concealed weapon. Defendant was searched and a set of car keys recovered. The keys fit the ignition and trunk of the Monte Carlo abandoned in the lower Rattlesnake area. Later, defendant was charged with deliberate homicide in connection with the death of Allen Kimery.

Following his arrest defendant was taken to St. Patrick's Hospital where he was treated by the emergency room physician, Dr. Warren Guffin, for abrasions and lacerations from bullet fragments or bullet injury and blood and urine samples were drawn. Psychologist Herman Walters and psychiatrist William Stratford also

5

interviewed defendant shortly after his arrest to determine if defendant was a risk to himself and to observe defendant's general emotional and cognitive functioning.

Fred Van Dyken took the stand on his own behalf at his second trial. The defendant testified that he had been drinking and smoking marijuana on the night of December 5 and morning of December 6; that he remembered being at his friends' Tim and Jeff Braida's home but not how he got there; that he did not remember being at the SuperAmerica station or driving anywhere in Missoula; that he remembered being pulled over, the presence of flashing lights, and someone approaching his car; that he remembered accelerating his car and that he had his gun and "threw a bullet over [his] left shoulder;" that he does remember getting the gun; that he remembered a lot of loud bullets and that after he drove away there was a hole in the window. Defendant also testified that he had no desire, purpose or intent to shoot the officer and that because he was afraid the officer was still pursuing him after he drove away, defendant "ditched" his car and called his friends the Braidas.

On cross-examination defendant testified his purpose in grabbing the gun was to throw a shot over his shoulder and that he intended to shoot the gun. Defendant also admitted that he knew the person approaching his car was an officer when he saw the flashing lights. Testimony was also elicited that defendant had rolled down the driver's window before shooting.

The defense presented evidence intended to show that, because

of the amount of liquor consumed on the night in question, defendant was unable to form the mental state of "knowingly" or "purposely" necessary to a conviction of deliberate homicide. The defense offered the testimony of its expert witness, Dr. Mandel, to show defendant was incapable of forming the necessary mental state. Dr. Mandel based his testimony on a three and one-half hour interview with defendant before the first trial, a one hour interview with defendant before the second trial and conversations with defendant's mother, Hope Van Dyken and his ex-mother-in-law, Josie Morgan and defendant's friend Chris Tigart. In rebuttal of Dr. Mandel's testimony, the State called Dr. Walters and Dr. Stratford, both of whom saw defendant shortly after his arrest. The State also presented in its case-in-chief, Dr. Guffin, the emergency room physician who treated defendant immediately after his arrest on December 6, who testified that there were no physical manifestations of defendant being under the influence of alcohol when Dr. Guffin examined him.

Defendant was charged by information with deliberate homicide arising out of the shooting death of Officer Allen Kimery in the early morning hours of December 6, 1984. The case was assigned to District Judge Thomas A. Olson and, following a change of venue, tried before a Park County jury in September, 1985. When, after thirteen hours of deliberation, the jury notified Judge Olson it was unable to reach a unanimous verdict, the judge, over defense counsel's objection, ordered the jury to continue its deliberations. Following two more hours of deliberation, the jury

was still unable to reach a decision and notified the judge of its stalemate. Judge Olson then declared a mistrial. Neither counsel for the defense or the prosecution objected to the procedure, nor did either counsel request that the jurors be polled.

On December 23, 1985, defendant appeared before Judge Olson and asked to change his plea to guilty pursuant to a plea agreement reached with the State. The judge rejected the plea, however, because the defendant disputed the intent element of the offense.

During the period between trials, both parties filed pretrial motions in the District Court and petitioned the Supreme Court. On June 3, 1986, the State filed a petition for supervisory control with the Supreme Court, seeking rulings on certain of its motions then before the District Court. This petition was denied. In a June 4, 1986 order concerning both parties' pretrial motions, the District Court denied defendant's motion to dismiss on grounds of double jeopardy and denied the State's motion to compel an independent psychiatric evaluation of the defendant designed to assist in determining the defendant's state of mind at the time of the shooting.

From this order, the defendant petitioned the Supreme Court for a writ of supervisory control and the State sought an interlocutory appeal. The Supreme Court consolidated the two proceedings and in a November 13, 1986 order found both to be interlocutory in nature and, therefore, not appealable. Additionally, the Court held the declaration of a mistrial under the circumstances did not constitute a bar to a second trial on the

grounds of former jeopardy.

The defendant then moved the Supreme Court for a rehearing on the double jeopardy issue. In its January 20, 1987 order denying the rehearing, the Supreme Court set out specific reasons why a second trial could be had without placing the defendant in double jeopardy.

After several recusals, Missoula District Judge James Wheelis assumed jurisdiction of the case, and the second trial was had, this time in Lewis and Clark County during June, 1987. In pretrial rulings, the District Court prohibited the defendant's expert witness, psychiatrist Michael Mandel, from reciting the defendant's version of the offense or testifying to the credibility of the defendant's statements about the events surrounding Officer Kimery's death. The defense then opted to place defendant Van Dyken on the stand.

The District Court also ruled that the testimony of the State's experts, psychiatrist William Stratford and psychologist Herman Walters, was restricted to their observations of the defendant and any unsolicited remarks made by him. The State's experts were not allowed to testify as to the results of any questions which they directed to the defendant when they examined him within the first few days following his arrest, because no Miranda warnings (Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) were given prior to their evaluation of the defendant.

Following a lengthy trial, the jury found the defendant guilty

9

of deliberate homicide. The defendant was sentenced to life imprisonment at the Montana State Prison and designated a dangerous offender. He is ineligible for parole or participation in the supervised release program.

It is from this judgment that the defendant appeals.

ISSUE I: Double Jeopardy

Defendant argues that his retrial on the charge of deliberate homicide violates Federal and State constitutional prohibitions against double jeopardy. The defendant bases this argument on two allegations: 1) at the first trial, the District Court declared a mistrial without first polling the jurors after they announced they were deadlocked, amounting to a mistrial without manifest necessity; and 2) the State, because it had the advantage of assessing the defense at the first trial, was able to significantly alter its posture at the second trial.

According to defendant, the jury instruction given concerning lesser included offenses contributed to the jury deadlock. At both the first and second trials the jury received the following instruction on lesser included offenses:

> In order to reach a verdict in this case, it is necessary that you consider the crime of deliberate homicide first, and that all twelve of you find the Defendant either guilty or not guilty of that charge.
>
> In the event you find the Defendant guilty of deliberate homicide, you need go no further as you will have reached a verdict.
>
> In the event you find the Defendant not guilty of deliberate homicide, you must then

consider the lesser offense of mitigated deliberate homicide. All twelve of you must find the Defendant guilty or not guilty of this charge.

If you find the Defendant guilty of mitigated deliberate homicide, you have reached a verdict, and you need proceed no further.

If you find the Defendant not guilty of mitigated deliberate homicide, you must then consider the lesser offense of negligent homicide. All twelve of you must find the Defendant guilty or not guilty of this charge. When you have done so, you have reached a verdict, and you need proceed no further.

Defendant argues that the District Court should have polled the jury to determine if, at any time during its deliberations, the jury had unanimously voted to acquit the defendant of deliberate homicide and was deadlocked only as to the defendant's guilt on one of the lesser-included offenses. The defendant contends that if the jury had in fact acquitted the defendant of deliberate homicide, a second trial on that charge would amount to double jeopardy. Defendant further argues that by failing to poll the jury, the District Court effectively precluded the operation of the double jeopardy bar. Under such circumstances, the defendant avers, District Judge Olson declared a mistrial without manifest necessity and the defendant was therefore subjected to double jeopardy on the deliberate homicide charge.

The thrust of defendant's argument is that failure to poll the jury impliedly acquitted the defendant of deliberate homicide and the District Court further erred in denying him an evidentiary hearing on the matter. This is the very issue which the defendant

raised in his 1986 application to this Court for a writ of supervisory control. In both our November 13, 1986 order dismissing the application and our January 20, 1987 order denying the petition for rehearing on the same matter we rejected defendant's argument. As such, the doctrines of both res judicata and law of the case prevents an appellant from raising the issue on appeal because the issue has been previously resolved by this Court in this case.

Whether labeled res judicata or law of the case, the effect is the same.

> Prior Montana cases disclose the general rule that where a decision has been rendered by the Supreme Court on a particular issue between the same parties in the same case, whether that decision is right or wrong, such decision is binding on the parties and the courts and cannot be relitigated in a subsequent appeal. (Citations omitted.)
> . . .
>
> [A]n exception to this general rule exists where the case must be remanded to the District Court for further proceedings because of reversal on an unrelated issue. In such case this Court may correct a manifest error in its former opinion and announce a different ruling to be applied prospectively to future proceedings in the case. This exception to the general rule is recognized in Montana at least since 1955 when we held that the law of the case announced in the first appeal, and which governed the second trial, does not prevent the appellate court from correcting a manifest error in its former opinion to apply to future proceedings where doing so promised justice without substantial injury to anyone. (Citations omitted.)

State v. Zimmerman (1977), 175 Mont. 179, 185, 573 P.2d 174, 177-78.

Our earlier decision rendered in response to defendant's earlier application for writ of supervisory control addressing the issue of failure to poll the jury before declaring a mistrial remains binding and cannot be relitigated. None of the stated exceptions apply in this case.

In the second prong of his double jeopardy attack, defendant contends that the declaration of mistrial was without manifest necessity and thus, afforded the State an unfair advantage in the second trial. Defendant asserts that the State used the first trial as a trial run and was able to strengthen its case in the second trial. Defendant further argues, as he argued in a pretrial motion, that the State should be prohibited in the second trial from presenting "substantial additional categories of evidence not presented at the first trial or from substantially altering the posture of the defense case in the State's favor as a result of events occurring at the first trial." The District Court denied defendant's motion. Likewise, we reject his argument.

As is often noted the double jeopardy clause of both the United States and Montana constitutions provide three basic protections. It protects against (1) a second prosecution for the same offense <u>after acquittal</u>; (2) a second prosecution for the same offense <u>after conviction</u>; and (3) multiple punishments for the same offense. United States v. DiFrancesco (1980), 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328, 340. (Emphasis added.)

Defendant would have us believe that double jeopardy protection against prosecution for the same offense after acquittal

13

bars retrial because the jury was not polled, and therefore a declaration of mistrial without manifest necessity resulted. Thus, defendant suffered a second prosecution for the same offense after he was impliedly acquitted.

As discussed above there is no merit to defendant's argument that he should have been impliedly acquitted of deliberate homicide because the judge did not inquire into the reasons for the jury deadlock, thus resulting in a mistrial without manifest necessity. The mistrial was declared because the jury could not reach a verdict. A declaration of mistrial under such circumstances is manifestly necessary. Arnold v. McCarthy (9th Cir. 1978), 566 F.2d 1377, 1386; Arizona v. Washington (1978), 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717, 726-27.

We agree that where the State provokes a mistrial with the intention of subjecting the defendant to the burden of multiple prosecutions, the double jeopardy clause will prevent a retrial. United States v. Dinitz (1976), 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267, 276. In the case at bar, however, the State in no way provoked the mistrial. Nor did the State request a mistrial. In addition, when District Court Judge Olson declared a mistrial, the defendant made no objection. As the United States Supreme Court has held:

> [T]he strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.

14

At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws. (Footnotes omitted.)

Arizona v. Washington, at 508-09, 98 S.Ct. at 832, 54 L.Ed.2d at 730.

The jury had deliberated for approximately fourteen hours and the foreman indicated to Judge Olson that further deliberations would most likely not result in a verdict. Under the circumstances the mistrial was declared for manifest necessity.

The defendant's argument that the State could not use evidence at the second trial which had not been presented at the first trial is not compelling. The general rule of law is that where the first proceeding results in a mistrial, the parties are placed in the same position as if there had been no trial in the first instance. Section 46-16-701, MCA; Waite v. Waite (1964), 143 Mont. 248, 389 P.2d 181; 58 Am.Jur.2d New Trial, § 588 (1989).

Here, neither party gained an unfair advantage over the other because of the mistrial. Each was able to use the knowledge gained from having gone through the first trial and alter their positions accordingly. We hold that the District Court properly denied

15

defendant's pretrial motion to limit evidence in the second trial to only that introduced in the first.

ISSUE II: Defense Expert Testimony

The defendant called Dr. Michael Mandel as an expert witness at both trials. With the help of Dr. Mandel, a psychiatrist, defendant sought to establish that he was incapable of forming the necessary intent to commit deliberate homicide at the time defendant killed Officer Kimery.

Defendant argues that Rules 803(4), 703, and 705, M.R.Evid., support admission of Dr. Mandel's testimony regarding events surrounding Officer Kimery's shooting.

Rule 803(4), M.R.Evid., an exception to the hearsay rule permits:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the case or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Rule 703 deals with the basis of opinion testimony by experts:

> The facts in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 705 addresses disclosure of facts underlying an expert opinion:

> The expert may testify in terms of

opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The above rules, however, are subject to Rule 403, M.R.Evid. Evidence, although relevant, may nonetheless be excluded if its probative value is outweighed by its potential for prejudice. Rule 403, M.R.Evid. Furthermore, this Court has consistently held that "the question of admissibility of evidence must in every case be left largely to the sound discretion of the trial court, subject to review only in case of manifest abuse." Cech v. State (1979), 184 Mont. 522, 531-32, 604 P.2d 97, 102; Gunderson v. Brewster (1970), 154 Mont. 405, 466 P.2d 589; Moen v. Peter Kiewit & Sons, Co. (1982), 201 Mont. 425, 655 P.2d 482. This discretion includes wide latitude in determining the admissibility of expert testimony. Cash v. Otis Elevator Co. (1984), 210 Mont. 319, 332, 684 P.2d 1041, 1048; Krohmer v. Dahl (1965), 145 Mont. 491, 402 P.2d 979.

We find no abuse in the discretion exercised by the trial court. Judge Olson rejected defendant's argument that Dr. Mandel, under Rules 703 and 705, might rely on the description of the shooting as related by the defendant and disclose this description even though it might otherwise be inadmissible. At the second trial the defendant again raised this issue. When defendant requested a rehearing on the matter, Judge Wheelis agreed with Judge Olson's order and opinion of June 4, 1986. In the opinion Judge Olson noted that to allow Dr. Mandel to repeat defendant's version of the shooting would be to throw out the other rules of

17

evidence and to .ignore the time-honored reasons for excluding hearsay and unreliable evidence. The opinion continued:

> According to Judge Weinstein, it is assumed for purposes of Rule 703, that the underlying facts are reliable and trustworthy. Further, Weinstein notes that the reason for disclosure is not to prove the underlying facts but to show what the experts are using for his [sic] opinion. Weinstein is also of the view that the reliability question, which must be asked when using Rule 703, is the same question to be asked when allowing a medical expert to repeat a medical history under Rule 803(4). See 4 Weinstein's Evidence, 803(4)(01), at 803-146 to -147.
>
> . . .
>
> [T]he testimony of Fred Van Dyken concerning the shooting event is not sufficiently reliable to qualify under the medical exception to the hearsay rule set forth in Rule 803(4).

The District Court then prohibited Dr. Mandel from testifying to defendant's version of the shooting event. Because the defendant's testimony was not sufficiently reliable to qualify under the Rule 803(4) medical exception, neither was it reliable enough to be used as the basis for Dr. Mandel's expert opinion under Rule 703, M.R.Evid.

The trial court here properly exercised its discretion. Under Rule 703, Rule 705 or Rule 803(4), Dr. Mandel's testimony was subject to limitations. As our sister court in Utah noted:

> A psychiatrist or a psychologist of course cannot be made a conduit for testifying in court as to any and all out-of-court statements made. (Footnote omitted.) As with admission of evidence of any kind, great discretion is accorded the trial judge in the determination of admissibility. The trial court must, as with any evidence, assess the

> inherent reliability of the testimony, the relevance of the testimony, and undertake a balancing test, particularly of prejudice versus probativeness under Rule 403.

State v. Schreuder (Utah 1986), 726 P.2d 1215, 1225. It is apparent from the portion of the opinion and order set out above that the trial court in the present case considered the reliability and relevancy of the testimony attempted to be conveyed through Dr. Mandel. We find no abuse of discretion.

Defendant also argues that disallowing Dr. Mandel to testify regarding defendant's version of the shooting violated defendant's due process rights to present relevant defensive evidence. Defendant claims that the trial court's decision denied him his right against self-incrimination and the opportunity to present a complete defense.

As previously noted the trial court only curtailed Dr. Mandel's testimony regarding the actual shooting event. No limitations were placed on his testimony concerning defendant's other statements to him or concerning other information the doctor relied on as a basis for his expert opinion. Dr. Mandel did, in fact, testify about the bases of his opinion which included conversations had with the defendant.

It is error to allow psychiatric witnesses to state their ultimate conclusion without discussing the bases for such conclusion. State v. Rhoades (W.Va. 1981), 274 S.E.2d 920, 922; State v. Wade (N.C. 1979), 251 S.E.2d 407, 409. However, no error results where, as here, the expert is permitted to testify as to the bases of his opinion.

19

To allow Dr. Mandel's recitation of defendant's statements was hearsay ruled not within any exception. The defendant has no constitutional right to have these hearsay statements placed in evidence. It must be remembered that,

> A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

Harrison v. United States (1968), 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051.

Defendant next avers that because the trial court granted the State's motion in limine regarding the expert testimony, defendant was compelled to testify. Thus, he argues, his right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution and Art. II, Sec. 25 of the Montana Constitution was violated. These guarantees protect persons from testifying against themselves. "The key to this rests with determining if appellant is compelled to testify or merely required to make tactical decisions regarding the defense of his position." Matter of C.L.R. (1984), 211 Mont. 381, 386, 685 P.2d 926, 929.[1]

---

[1] Superseded by statute as stated in Matter of Baby Boy Scott (Mont. 1988), 767 P.2d 298, 45 St.Rep. 2362. The 1985 Legislature amended § 41-3-609, MCA, thus superseding that portion of Matter of C.L.R. which set forth the standard for terminating parental rights. That part of the opinion dealing with the Fifth Amendment protection against self-incrimination is unaffected by the later case of Matter of Baby Boy Scott.

20

Here it is clear that defendant's decision to testify was a tactical decision arrived at by him and his counsel. The trial court inquired about the decision, saying "I take it there is no problem with the decision of the defense to place the defendant on the stand and, I gather, testify about the substance of the trial." Defendant or his counsel made no objection or response.

The mere fact that defendant's version of the shooting would not otherwise have been brought before the jury does not render his decision compelled. As the United States Supreme Court held, "That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against self-incrimination." Williams v. Florida (1970), 399 U.S. 78, 84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446, 451.

ISSUE III: Lesser-Included Offenses

Defendant asserts that the trial court erred in its refusal, upon request of the defense, to instruct the jury that it could consider the two lesser included offenses without first unanimously acquitting the defendant of the principal offense. At the second trial the defense proffered two "failure to agree" instructions. Such instruction, the defendant argues, would permit the jury to consider and deliberate about all possible offenses, i.e., the charged offenses and all lesser-included offenses, in the event there is any disagreement over the defendant's guilt as to the principal offense.

21

The trial court, however, gave the "acquittal first" instruction (alternatively labeled "lesser included offenses" instruction) previously set out in the double jeopardy discussion above. Instructions stating the elements of deliberate homicide, deliberate mitigated homicide, and negligent homicide were also given.

The basic rule in this state is that the trial court's instructions must cover every issue or theory having support in the evidence. State v. Thornton (1985), 218 Mont. 317, 320, 708 P.2d 273, 276. Also, the court must instruct on lesser included offenses if any evidence exists in the record which would permit the jury to rationally convict the defendant of a lesser offense and to acquit him of a greater. Thornton, at 317, 708 P.2d at 276 (quoting State v. Ostwald (1979), 180 Mont. 530, 538, 591 P.2d 646, 651). On appeal this Court is charged with reviewing jury instructions as a whole and if they fairly cover the issues and tender the case to the jury, they are sufficient. State v. Smith (1986), 220 Mont. 364, 382, 715 P.2d 1301, 1312.

The defendant admits the giving of an "acquittal first" instruction is not per se erroneous, but argues that where a defendant requests a "failure to agree" instruction, giving an "acquittal first" instruction is error. This Court has not previously considered such an argument, but many other courts have, with a wide variety of results. The United States Supreme Court has not resolved the conflict.

In a recent case the Court of Appeals of New York addressed

22

the giving of acquittal first versus failure to agree instructions.

> [A]pproval of the "unable to agree" transition charge sought by the defendant would have a deleterious effect on the [State], for whose benefit the option of the submission of a lesser included offense was originally created "to prevent the prosecution from failing where some element of the crime charged was not made out" (People v. Murch, 263 N.Y. 285, 291, 189 N.E. 220). [Footnote omitted.] Under such a charge, the jury could convict a defendant of the lesser included offense without actually having found him not guilty of the greater. And, regardless of the jury's actual findings or lack of findings regarding the greater offense, the defendant would be deemed not guilty of its commission . . . and a retrial on the greater offense would be barred under settled double jeopardy principles. [Citations omitted.] . . . [E]stablished precedent suggests that a contrary policy should prevail: that the [State] should not be precluded from retrying a defendant on the greater offense unless a jury actually finds him innocent of that charge.

People v. Boettcher (N.Y. 1987), 505 N.E.2d 594, 597.

The Boettcher court continued its discussion, noting Federal case holdings that a defendant is entitled to a failure to agree instruction upon timely request, but rejected the Federal cases because,

> [t]hey give insufficient weight to the principle that it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts it finds to the law it is charged [citation omitted]. It is no doubt true, as we have noted in the past, that in jury rooms, as well as all other deliberative bodies, some strong members are able to impress their will upon the weaker [citation omitted]; but acknowledgment of the imperfection of human nature is quite a different thing from the creation of an environment conducive to such behavior. For the same reason, we must reject

23

the defendant's contention that the [failure to agree] charge promotes efficient use of judicial resources by obviating the need for protracted deliberations when a jury becomes deadlocked on the top count by providing a lesser included offense upon which a compromise can be reached.

Boettcher, 505 N.E.2d at 597-98.

We find the New York court's reasoning compelling. For the reasons stated above we hold that giving the acquittal first instruction even in the face of defendant's request for the failure to agree instruction was not error.

ISSUE IV: Mental State

The District Court ruled in favor of the State regarding the jury instruction to be given on the definition of "purposely" and "knowingly." The following instructions were given:

A criminal homicide is deliberate homicide if it is committed purposely or knowingly.

A person acts purposely with respect to conduct which is an element of the offense or to a result which is an element of the offense when he has the conscious object to engage in that conduct or to cause that result.

A person acts knowingly with respect to the result of conduct or a circumstance described by a statute defining an offense when he is aware that it is highly probable that the result will be caused by his conduct or the circumstance. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence. Equivalent terms such as "knowingly" or "with knowledge" have the same meaning.

Defendant argues that the instruction set out above concerning

24

the mental state required to convict on a charge of deliberate homicide was incorrect. Defendant contends that his proposed instruction, which the trial court ruled an erroneous statement of the law, should have been given. The proposed instruction would have required that the jury find the defendant had acted "with the knowledge he was causing or with the purpose to cause the death."

Defendant's proposed instruction is not the law in Montana. It is no longer necessary to prove specific intent as an element of the crime unless the statute defining the offense requires as an element thereof specific purpose. State v. Starr (1983), 204 Mont. 210, 218, 664 P.2d 893, 897. As the trial court noted in refusing defendant's proffered instructions, a defendant can properly be convicted of deliberate homicide even though he may not have intended that the death result from the act where he contemplated the same kind of harm or injury to the victim. State v. Sigler (1984), 210 Mont. 248, 264-66, 688 P.2d 749, 757-58.

Defendant labels the Sigler holding an "anomaly" and contends it should be overruled. On the contrary, Sigler is well-settled law and its holding has been affirmed often by this Court. See State v. Blalock (1988), 232 Mont. 223, 756 P.2d 454; State v. McKimmie (1988), 232 Mont. 227, 756 P.2d 1135; State v. Ballenger (1987), 227 Mont. 308, 738 P.2d 1291; State v. Koepplin (1984), 213 Mont. 55, 689 P.2d 921. We once again affirm the Sigler holding and find that the trial court correctly instructed the jury concerning mental state.

25

ISSUE V:    Rebuttal Testimony of State's
Expert Witness

Finally, defendant contends the trial court abused its discretion in allowing the State's expert witnesses, psychiatrist William Stratford and psychologist Herman Walters, to rebut Dr. Mandel's opinion regarding the defendant's mental state. Defendant premises his objection on the fact no <u>Miranda</u> warnings were given before Dr. Stratford and Dr. Walters interviewed him within hours of his arrest on December 6, 1984. Defendant further contends that any communication between himself and the doctors is protected by the psychologist-patient privilege provided in § 26-1-807, MCA.

Preliminary determination as to the qualification of a person to be a witness rests with the trial court. Rule 104(a), M.R.Evid., and § 46-16-211, MCA. The trial judge determines the witness' competency and the party asserting incompetency has the burden of proving it. State v. Stephens (1982), 198 Mont. 140, 143, 645 P.2d 387, 389. Unless a specific exception applies, a witness generally may be disqualified only if he is incapable of expressing himself or is incapable of understanding the duty to tell the truth. Rule 601, M.R.Evid. State v. D.B.S. (1985), 216 Mont. 234, 243, 700 P.2d 630, 636.

On appeal, this Court defers to the discretion of the District Court on the admission of evidence, State v. LaPier (1984), 208 Mont. 106, 111, 676 P.2d 210, 213, and reviews the District Court's rulings for manifest abuse. State v. Courville (Mont. 1989), 769 P.2d 44, 47, 46 St.Rep. 338, 341.

Upon review of the record as a whole, we find no abuse of

26

discretion here. We defer to the trial court's discretion and find that the rebuttal testimony of Dr. Stratford and Dr. Walters was properly admitted.

Finding no error in the lower court proceedings, we affirm the jury verdict below.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

27