STATE OF NEBRASKA, APPELLEE, V. ROY L. JONES, APPELLANT.
515 N.W.2d 654

Filed May 6, 1994.    No. S-92-1054.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

BOSLAUGH, J.

The defendant, Roy L. Jones, was charged with first degree murder and use of a firearm in the commission of a felony in the shooting death of his wife, Tara Jones. He was convicted by a jury of second degree murder and use of a firearm and was sentenced by the district court to consecutive terms of imprisonment for not less than 50 years on the murder conviction and 5 to 10 years for the use of a firearm conviction.

On March 22, 1992, the defendant left Omaha, Nebraska, to take a job selling cars in Salt Lake City, Utah. His wife, Tara, and her 6-year-old son, Brian, planned to move to Utah with the defendant after the end of the school year.

During that first week in Utah, the defendant called his wife at home several times a day. On Thursday, March 26, Tara told the defendant she would be attending a cat show in Sioux City, Iowa, on Saturday and Sunday. She planned to drive there with two of her friends, Tonya Wendt and Barbara Curry.

On Friday, March 27, the defendant was unable to reach his wife at home when he tried to call. On Friday evening, he called Wendt, who told him that due to illness of her children, she was unable to attend the cat show, and that Tara had driven up with some other people on Friday. Wendt testified at trial that the

defendant threatened to kill her and Tara if she was lying.

Later that evening, the defendant called Curry, who also told him she had decided not to go to Sioux City. She told the defendant that Tara had gone to the cat show with some other people. Curry also testified that the defendant threatened to kill her and Tara if she was covering for Tara.

The defendant became concerned about the whereabouts of his wife and called the paternal grandmother of Tara's son. He discovered that Brian had been dropped off at his grandmother's by Tara on Thursday night.

The defendant then determined where the cat show was being held in Sioux City and attempted to locate Tara there. He discovered that Tara was not registered at the cat show. He then called the cat show hall, asked that Tara be paged, and found that no one responded to the page.

The defendant called his mother-in-law, Sandy Schaeffer, who told him that Tara had gone to the Sioux City cat show.

The defendant decided to come back to Omaha to try to find his wife. He purchased an airline ticket and returned to Omaha on Saturday, March 28. The defendant was met at the airport by his father, and they drove to Tara's apartment to see if the cats were there. Upon entering the apartment, he observed that two of their four cats were gone.

The defendant later discovered that there was a cat show taking place in the Chicago area and that Tara had gone to that show. The defendant called the Champaign-Urbana police, telling them he needed to contact his wife for a family emergency. The police station was across the street from the building housing the cat show, and the police agreed to contact her. The police contacted Tara, and she phoned the defendant.

While waiting for Tara to call him, the defendant looked through her dresser drawer and noticed that her lingerie and miniskirts were missing. A neighbor testified that she heard the defendant yelling, " 'I'm going to blow her head off.' "

When Tara called, she was unable to explain where she was staying, and they got into an argument. Tara told the defendant she would be returning to Omaha by airplane on Sunday evening. During the rest of Saturday evening, the defendant made several phone calls to his mother-in-law and also spoke

again with his wife.

On Sunday, the defendant and his father went to the airport and picked up his and Tara's car. After picking up the car, the defendant returned alone to the apartment and left a note and his wedding ring for Tara. He expressed his regret that she felt the marriage was over and stated that he would always love her.

Late Sunday night, March 29, the defendant received a phone call at his parents' house from Tara. She was at her mother's house and asked if the defendant would come over.

The defendant went to see Tara and argued with her in the presence of her mother and stepfather. During the argument, Tara told the defendant that she had been with another man in Illinois and had slept with him.

The defendant then returned to his parents' home. Sometime thereafter, Tara called and asked him to return to her parents' residence. The defendant went back, and he and Tara had sex. He returned to his parents' home around 9 o'clock on Monday morning.

The defendant thought after spending the night with Tara that things were going to be better between them. He returned later that morning to pick up Tara to take her home. Upon his return, Tara indicated that she was still confused and needed more time. The defendant reacted with anger and disgust.

Later that Monday afternoon, the defendant returned to his apartment for the purpose of retrieving some clothes and his father's video cassette recorder. When he arrived at the apartment, his wife, stepson, and Tara's brother Scott were there.

After a short period of time, the defendant asked Scott to leave so he could be alone with Tara to talk things out. After Scott left, the defendant and Tara began to talk and soon began to argue about her infidelity and their relationship.

The argument escalated, and Tara locked herself in the master bedroom of the apartment. The defendant kicked in the door. He testified that Tara was pointing a gun at him, that they struggled over the gun, and that he snapped. He did not recall the shooting itself.

Tricia Ferguson, a resident of the apartment complex, testified that on March 30, as she was driving into the

apartment parking lot, she saw what appeared to be Tara trying to get back into her apartment through the window. Next she saw Tara's shirt "fly off" and Tara running away from the window. Ferguson then observed a hand with a gun in it extend from the window area and heard approximately four shots. As the shots were fired, Tara staggered and eventually fell. Within seconds, the defendant came out of the apartment and shot Tara two more times in the head. Then he went back into the apartment.

The shooting occurred in the daylight hours in front of numerous witnesses, including several construction workers who were all yelling at the defendant to leave Tara alone. Their testimony concerning the killing was the same as Ferguson's.

Dr. Jerry Jones, the pathologist who performed the autopsy on Tara, testified that the two shots to her head were the fatal shots.

From Friday, March 27, through the time the defendant shot and killed his wife, the defendant had been drinking constantly.

On appeal to this court, the defendant contends that the trial court erred by overruling the defendant's objection to jury instruction No. 6, which required the jury to find the defendant not guilty of murder in the second degree before they could consider the lesser-included offense of voluntary manslaughter; that the trial court erred by overruling the defendant's objection to that portion of instruction No. 11 which defines malice as the state of mind shown by intentionally doing a wrongful act; and that the trial court erred by giving Nebraska's pattern jury instruction NJI 14.08 on reasonable doubt because that instruction violates due process in that it equates reasonable doubt with substantial doubt, grave uncertainty, and moral certainty contrary to the U.S. Supreme Court's ruling in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990).

Instruction No. 6 has been referred to as a "step" instruction or "acquittal first" instruction. As given in the defendant's trial, it is set forth as follows:

Under Count I of the Information in this case, depending on the evidence, you may find the defendant:

A. Guilty of murder in the first degree; or

B. Guilty of murder in the second degree; or

C. Guilty of voluntary manslaughter; or

D. Not guilty.

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of murder in the first degree in Count I are:

1. That the defendant, Roy L. Jones, killed Tara L. Jones;

2. That the defendant did so purposely and with deliberate and premeditated malice;

3. That the defendant did so on or about March 30, 1992; and

4. That the defendant did so in Douglas County, Nebraska.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of murder in the first degree necessary for conviction.

If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements is true, it is your duty to find the defendant guilty of the crime of murder in the first degree in Count I, and you shall complete Verdict Form 1; and you shall not then consider the next lesser-included offense hereafter set forth in this instruction. On the other hand, if you find that the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty of the crime of murder in the first degree in Count I. You shall then proceed to consider the lesser-included offense of murder in the second degree.

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of murder in the second degree are:

1. That the defendant, Roy L. Jones, killed Tara L. Jones;

2. That the defendant did so intentionally but without premeditation;

3. That the defendant did so on or about March 30, 1992; and

4. That the defendant did so in Douglas County, Nebraska.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of murder in the second degree necessary for conviction.

If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements is true, it is your duty to find the defendant guilty of the crime of murder in the second degree in Count I, and you shall complete Verdict Form 2, and you shall not then consider the next lesser included offense hereinafter set forth in this instruction. On the other hand, if you find the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty of the crime of murder in the second degree in Count I. You shall then proceed to consider the next lesser-included offense of voluntary manslaughter.

The material elements which the state must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of voluntary manslaughter are:

1. That the defendant, Roy L. Jones, killed Tara L. Jones;

2. That the defendant did, without malice, kill Tara L. Jones intentionally upon a sudden quarrel;

3. That the defendant did so on or about March 30, 1992; and

4. That the defendant did so in Douglas County, Nebraska.

The state has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements of the crime of voluntary manslaughter necessary for conviction.

If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements is true, it is your duty to find the defendant guilty of the crime of

voluntary manslaughter in Count I; and you shall complete Verdict Form 3. On other other [sic] hand, if you find the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty of the crime of voluntary manslaughter and not guilty of any charge in this case in Count I, and you shall complete Verdict Form 4.

The burden of proof is always on the State to prove beyond a reasonable doubt all of the material elements of the crime charged or included therein, and this burden never shifts.

The defendant contends that since the jury could not consider the offense of voluntary manslaughter until it unanimously reached a verdict of not guilty on the offense of second degree murder, in any case where a greater charge than voluntary manslaughter is presented to the jury, the possibility of the jury returning a verdict of guilty of voluntary manslaughter is effectively negated.

The instruction as given does not require that the jury unanimously decide that the defendant is not guilty of first degree murder before considering a lesser offense. Although any verdict finally arrived at by the jury must be unanimous, the jury is not required in its preliminary deliberations and discussion to be unanimous before considering whether the defendant is guilty of a lesser offense.

The defendant argues that if the jury deliberates and finds that an intentional killing occurred without premeditation, they would have to find the defendant guilty of second degree murder without ever getting to the issue of whether or not the intentional killing was upon a sudden quarrel, the element that under *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989), distinguishes manslaughter from second degree murder.

The problem with instruction No. 6 is not that it requires the jury to acquit the defendant on the greater charge before considering the lesser charge. An acquittal first instruction provides "for a more logical and orderly process for the guidance of the jury in its deliberations." *State v. Wussler*, 139 Ariz. 428, 430, 679 P.2d 74, 76 (1984). There are many

jurisdictions that approve the propriety of instructions requiring acquittal of the most serious offense charged before consideration of lesser offenses. See, e.g., *Lindsey v. State*, 456 So. 2d 383 (Ala. Crim. App. 1983), *aff'd* 456 So. 2d 393 (Ala. 1984), *cert. denied* 470 U.S. 1023, 105 S. Ct. 1384, 84 L. Ed. 2d 403 (1985); *Whiteaker v. State*, 808 P.2d 270 (Alaska App. 1991); *State v. Wussler, supra*; *People v. Padilla*, 638 P.2d 15 (Colo. 1981); *State v. Sawyer*, 227 Conn. 566, 630 A.2d 1064 (1993); *Lamar v. State*, 243 Ga. 401, 254 S.E.2d 353 (1979), *appeal dismissed* 444 U.S. 803, 100 S. Ct. 23, 62 L. Ed. 2d 16; *State v. Van Dyken*, 242 Mont. 415, 791 P.2d 1350 (1990), *cert. denied* 498 U.S. 920, 111 S. Ct. 297, 112 L. Ed. 2d 251; *People v. Boettcher*, 69 N.Y.2d 174, 505 N.E.2d 594, 513 N.Y.S.2d 83 (1987); *State v. Wilkins*, 34 N.C. App. 392, 238 S.E.2d 659 (1977), *review denied* 294 N.C. 187, 241 S.E.2d 516; *Commonwealth v. Hart*, 388 Pa. Super. 484, 565 A.2d 1212 (1989), *appeal denied* 525 Pa. 642, 581 A.2d 569 (1990); *State v. McNeal*, 95 Wis. 2d 63, 288 N.W.2d 874 (Wis. App. 1980).

The problem with instruction No. 6 is that because of the holding of *State v. Pettit, supra*, in any case where evidence of a greater charge than manslaughter upon a sudden quarrel is presented to the jury, the possibility of returning a verdict of guilty of manslaughter upon a sudden quarrel is effectively negated. According to *Pettit*, the only element that distinguishes manslaughter upon a sudden quarrel and second degree murder is the element of the sudden quarrel, since both killings are intentional.

In *Pettit*, the majority held that to be guilty of manslaughter committed upon a sudden quarrel, the killer must commit the slaying with the intent to kill. The majority relied on cases from other jurisdictions that had statutes which specifically distinguished and defined voluntary and involuntary manslaughter.

As the dissenters in *Pettit* point out, "the words 'voluntary' and 'involuntary' have not been a part of Nebraska's manslaughter statute since 1873." 233 Neb. at 474, 445 N.W.2d at 912 (Fahrnbruch, J., dissenting). Currently, Nebraska's manslaughter statute provides: "(1) A person commits manslaughter if he kills another without malice, either upon a

sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act. (2) Manslaughter is a Class III felony." Neb. Rev. Stat. § 28-305 (Reissue 1989).

Neb. Rev. Stat. § 28-304 (Reissue 1989) provides: "(1) A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation. (2) Murder in the second degree is a Class IB felony."

Under the present statutes, second degree murder is the intentional killing of another without premeditation. Manslaughter is the killing of another without malice, upon a sudden quarrel, or an unintentional killing while in the commission of an unlawful act.

Malice has most recently been defined in our cases as "that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse." *State v. Thompson,* 244 Neb. 375, 399, 507 N.W.2d 253, 270 (1993).

Since our statutes define manslaughter as a killing without malice, there is no requirement of an intention to kill in committing manslaughter. The distinction between second degree murder and manslaughter upon a sudden quarrel is the presence or absence of an intention to kill. *State v. Pettit,* 233 Neb. 436, 445 N.W.2d 890 (1989), was incorrect in its reasoning and holding, and to that extent, it is overruled.

At the time instruction No. 6 was given to the jury, it was appropriate to require the jury to acquit on the greater charge before considering the lesser. Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *State v. Bartholomew,* 212 Neb. 270, 322 N.W.2d 432 (1982).

The defendant's argument that he was prejudiced because the jury was unable to consider his defense that the killing was manslaughter is without merit because under any type of instruction, "the jury would have been required to consider the evidence in relation to the greater charge first." *State v. Yamashiro,* 8 Haw. App. 595, 608, 817 P.2d 123, 130 (1991). Under the evidence and circumstances of this case, it cannot reasonably be said that the verdict was compelled by the instruction rather than by the evidence.

However, instruction No. 6 is erroneous for a different reason. In *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994), we held that malice is a necessary element of murder in the second degree and that an instruction that failed to include malice as an essential element of murder in the second degree was plain error and was prejudicial. This error requires that the judgment be reversed and the cause be remanded for a new trial.

Next, the defendant contends that the trial court erred in giving instruction No. 11, which reads as follows:

The Nebraska Criminal Code in full force and effect at the time alleged in the Information pertaining to the crime of voluntary manslaughter provides in substance as follows:

"(1) A person commits manslaughter if he kills another without malice . . . upon a sudden quarrel . . . [.]"

"Malice" is defined as that condition of the mind which is shown by intentionally doing a wrongful act without just cause or excuse. It means any willful or corrupt intention of mind.

The defendant argues that the definition is confusing when it is combined with the manslaughter instruction requiring a showing of an intentional killing upon a sudden quarrel.

The jury was also given instruction No. 12, which stated:

A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self control.

The phrase "sudden quarrel" does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and Tara Jones.

In considering the offense of voluntary manslaughter, you should determine whether the defendant acted under the impulse of passion suddenly aroused which clouded reason and prevented rational action, whether there existed reasonable and adequate provocation to excite the passion of the defendant and obscure and disturb his power of reasoning to the extent that he acted rashly and

from passion, without due deliberation and reflection, rather than from judgment, and whether, under all the facts and circumstances as disclosed by the evidence, a reasonable time had elapsed from the time of provocation to the instant of the killing for the passion to subside and reason resume control of the mind.

You should determine whether the suspension of reason, if shown to exist, arising from sudden passion, continued from the time of provocation until the very instant of the act producing death took place.

Therefore, if the evidence convinces you beyond a reasonable doubt that the defendant killed Tara Jones intentionally upon a sudden quarrel, you should find him guilty of the offense of manslaughter.

Since we are overruling the holding in *State v. Pettit, supra,* that manslaughter is an intentional killing of another under Nebraska law, both instructions Nos. 6 and 12 regarding the crime of manslaughter were in error. In each of those instructions, the trial court erroneously instructed the jury that to convict the defendant of voluntary manslaughter, the State was required to prove that the defendant intentionally killed the victim.

Finally, the defendant claims that the trial court erred in giving instruction No. 5, which defined reasonable doubt. Relying upon the ruling of the U.S. Supreme Court in *Cage v. Louisiana,* 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990), the defendant argues that his conviction should be reversed.

Instruction No. 5 is the same jury instruction on reasonable doubt we examined and approved in *State v. Morley,* 239 Neb. 141, 474 N.W.2d 660 (1991). Subsequently, on March 22, 1994, the U.S. Supreme Court found the Nebraska instruction on reasonable doubt not erroneous in *Victor v. Nebraska,* \_\_\_\_ U.S. \_\_\_\_, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994).

The judgment of the trial court is reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

SHANAHAN, J., not participating.

CAPORALE, J., concurring in part, and in part dissenting.

I agree that the trial court's omission of the element of malice in its definition of second degree murder requires that this cause be remanded for a new trial. See, *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994); *State v. Franklin*, 241 Neb. 579, 489 N.W.2d 552 (1992); *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991); *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988); *State v. Keithley*, 227 Neb. 402, 418 N.W.2d 212 (1988); *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983).

However, I disagree with the majority's view that *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989), was wrongly decided. Its careful analysis of the manslaughter statute, Neb. Rev. Stat. § 28-305 (Reissue 1989), is correct, and I adhere to it.

HASTINGS, C.J., joins in this concurrence and dissent.