STATE OF NEBRASKA, APPELLEE, V. KEVIN G. FRANKLIN, APPELLANT.

488 N.W.2d 552

Filed September 25, 1992.    No. S-91-504.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Defendant, Kevin G. Franklin, age 18, was charged by information with second degree murder, first degree assault, and two counts of use of a firearm in commission of a felony. The district court for Douglas County, sitting without a jury, convicted defendant of all four counts and sentenced him to life imprisonment for the murder, 4 to 6 years' imprisonment for the assault, and 4 to 6 years' and 3 to 5 years' imprisonment for the two counts of use of a firearm. The sentences are to be served consecutively, and credit was given for time served.

Defendant timely appealed. His sole assignment of error is that the district court "incorrectly applied the law to the Defendant's second degree murder and first degree assault convictions by following the State's theory of prosecution." We affirm.

The evidence at trial, viewed most favorably to the prosecution, as required by *State v. Lewis, ante* p. 334, 488 N.W.2d 518 (1992), showed the following facts:

Cheryl Collier, the assault victim, testified that the evening and night of August 31, 1990, she was at 3321 Manderson in Omaha. Also present at 3321 Manderson during all relevant parts of the evening were Bennie Booker; Laverne Morris (Booker's sister), who was the murder victim; Robert Ross (Booker's father); Vernon Turner (Booker's brother); and several children.

Throughout the evening Booker was arguing with Ricky and Garen Wright; with the Wrights' mother, Lilly Andersen; and with Booker's sister Tracey Booker. The argument with the Wright family centered around Booker's breaking some furniture belonging to the Wrights' sister. Booker admitted that he had "trashed" Linda Wright's house at about 5 p.m. because he "had just gotten into an argument" with her, but he could not remember what the argument was about.

In addition, Booker testified that Tracey Booker was angry with him because she thought he had called a company that day to come and repossess her car. Early in the evening, Booker and Tracey Booker "passed a few words," after which she attacked him with a knife. Ricky Wright, Tracey's boyfriend, told Booker that "he better not go out of the house anytime soon

because he was going to get him."

Defendant testified in his own behalf. Defendant is a longtime friend of Garen Wright. During the summer of 1990, defendant bought a 9-millimeter automatic handgun and a clip for $80, because he was

> having problems with these other people on the streets who they thought I was a gang member; but I told them, you know, I wasn't in no gangs and they were talking to me and I was, like, I don't want no part of it and so, you know, I got a gun, you know, to protect myself.

Defendant testified that on the night of August 31, 1990, about 8 or 8:30 p.m., he met Garen and Ricky Wright. They told defendant there had been a fight, and they wanted to use defendant's gun. Defendant agreed and got the gun from behind a tree across the street. The Wright brothers then left, and defendant went along, because "I went to see what they was going to do with my gun."

The Wright brothers and defendant went to Linda Wright's house and found her crying. Defendant said that he felt sorry for her, but he was not upset about what Booker had done to the house. The three then went to the K mart at 72nd and Ames, where Ricky Wright bought some bullets.

Garen Wright, defendant, and another friend drove to the house on Manderson about 10 p.m. Garen went in, while the others waited in the car. Defendant saw Booker and Garen come out of the house, and he also saw a woman whom he did not know.

Defendant testified that Booker and the woman tried to slam the door on Garen Wright's foot, and the door broke. He then said that Booker hit Garen in the face with some object. Garen's mouth was bleeding, he got in the car, and the group left. Defendant testified that Garen repeated about 15 times that he was going to kill Booker.

Following this incident, the police were called to 3321 Manderson at about 12:45 a.m. and left about 1:20 a.m.

Defendant, Garen Wright, and their companion met Ricky Wright and another friend. All five drove back to the house on Manderson. Apparently, the police had left by this time. Defendant testified that he thought they were going to pick up

Tracey Booker. Defendant drove the car up to the front of the house, and Ricky, with the gun, walked into the front yard.

Collier and Booker testified that they heard a car pull up outside the house, and Morris went to the window to look. One of the other adults also looked out the window, saw people getting out of the car, and told everyone to "get down."

Defendant testified that, at this point,

> Garen was next to me. He was saying, give me the gun, give me the gun. It was like I am going to kill Bennie. And somebody else said, give me the gun. And I said, no, just give it to me and Ricky gave me the gun and I walked up and Ricky was standing behind me and everybody else was in the car and I walked up to the front of the house and I seen someone in the window . . . .

Defendant testified that he knew there were two people in the house.

Defendant testified that he "thought that was Bennie in the window. I just seen a head in the window and then I just shot toward the door." He said that when he started firing, he was 15 feet from the house and he thought Booker was at the window. There were eight bullet holes in the bottom half of the door. The window in which he saw the person was about 3 or 4 feet from the door. He testified that he did not want to hit anyone, but just wanted to scare Booker. When asked why he shot into the door, he said, "I just didn't think of the consequences. I was just trying to scare him."

Collier testified that when the shooting started, she ran into the dining room, directly behind the living room, to help Robert Ross, who was blind, to get down. There she was shot in the hip and buttocks. When she was shot, she was in a direct line back from the front door. She testified that she saw bullet holes in the door, the window, and the window air conditioner unit. Collier testified that a minute or two after the shooting stopped, she saw Morris lying on the floor between the living room and the dining room.

The police received a call at 1:47 a.m. and returned to the house on Manderson within 5 to 10 minutes. They found Morris on the floor and ascertained that she had no pulse. Collier was taken to the hospital.

The parties stipulated that Morris died of the gunshot wound. The autopsy reported that the bullet was a "full metal jacketed bullet consistent with a 9.0 mm. bullet."

Defendant said he also intentionally shot the air conditioner unit that was in the window to the right of the door. He testified that the clip held 15 cartridges and that he fired all of them into the front of the house. The group then drove Garen Wright to a hospital so that he could have his mouth treated.

Defendant testified that Garen Wright heard on a CB radio in the hospital that two people had been shot at the house on Manderson. Garen told defendant and the others to leave and to return in a half hour to pick him up. Defendant and the others then dropped Ricky Wright off, hid the gun behind a bush, and went to a restaurant. They picked up Garen, returned for the gun, and went home.

Defendant testified that Ricky Wright came over about 7 a.m. and told him that Morris had been killed, and defendant said that he "just knew I made a mistake." Ricky and defendant then went to pick up Garen Wright, and the three drove around, devising an alibi. Later that afternoon, defendant sold the gun.

When defendant found out that the police were looking for him, he called the police station and "turned himself in." Defendant was arrested and taken to headquarters. There he was given the *Miranda* rights, and he was questioned by police on September 3, 1990. Initially, defendant attempted to state an alibi, but later confessed. Defendant gave an oral statement to the police, and he made a subsequent taped statement.

Defendant admitted that he stood in front of the house at 3321 Manderson and fired the shots into the house. Defendant stated that he was the only one with a gun. He said that the gun was a 9 millimeter. The shell casings found at the scene were 9-millimeter casings.

Defendant did not contend that he did not shoot into the house. The trial focused, rather, on his intent at the time of the shooting. After defendant's opening statement, in which counsel stated that defendant would testify that he intended only to scare Booker, and before the presentation of evidence, the prosecutor stated that defense counsel's theory of the law was wrong, and that

under the law of Nebraska for a second degree murder you don't have to intentionally try to kill someone shooting into a house where you know people are congregated with a loaded handgun in disregard of whether or not it is going to hit someone qualifies as a second degree murder. So that distinction should be made.

Throughout his opening statement and closing argument, the deputy county attorney posited the erroneous position that the firing of a gun into a house where the shooter knows there are people constitutes, in itself, second degree murder. The position is not correct, as pointed out to the trial court, and to this court, by defense counsel. The accurate statement would be that those facts *may* constitute second degree murder. The intent to kill is an element of second degree murder, and that intent may be proved by conduct such as defendant's in this case. Defendant's counsel made this distinction clear in his statements and final argument.

In his closing argument, defense counsel directed the court to the information and the statute for the proper elements of second degree murder. The information stated that "on or about the 1st day of September, 1990, KEVIN G. FRANKLIN . . . did then and there intentionally, but without premeditation, kill Laverne M. Morris" and "did then and there intentionally or knowingly cause serious bodily injury to Cheryl Collier."

The defense attorney showed the court a previous jury instruction of the court in an earlier second degree murder case, which properly stated the elements of second degree murder. Defense counsel rebutted cases given to the court by the prosecutor from other jurisdictions which have dissimilar second degree murder statutes. He also submitted several cases from Nebraska defining the elements of second degree murder, all of which required that the killing be done purposely and maliciously.

Defense counsel continued during closing argument:

[A] terrorist would have a defense if he can convince 12 jurors that he did not intend to kill anybody. . . . [B]ut that's the fact question for the jury to determine and that's the fact question that this court will determine as to what his intent was at the time that he opened fire on that house.

In response, the prosecutor repeated his erroneous argument, but continued:

> On the case here where he's talking about when you talk about intent, I think the instruction goes something to the effect that intent is rarely ever discernible by what someone says. You have to look at what their actions are and what they do. Your Honor, it is an insult to suggest that he accidentally or upon a sudden quarrel unloaded 15 rounds into the front of an occupied house killing one person outright and wounding another.

After an adjournment, the court found defendant guilty of all counts. The defense attorney then, for the first time, asked the court, "Can I ask you to justify what you actually found, your findings and application of the law?" Defense counsel stated, "I want to know if specifically you found from the evidence that my client beyond a reasonable doubt intentionally ·went up there and fired a firearm and intended to kill somebody?" The Court replied, "Why don't you give me a formal motion to that effect. I'm simply not prepared to go through my thought processes now and we'll talk about it." Five days later, defendant filed such a motion.

Neb. Rev. Stat. § 28-304 (Reissue 1989) states that a person is guilty of second degree murder if "he causes the death of a person intentionally, but without premeditation." A person is guilty of first degree assault if "he intentionally or knowingly causes serious bodily injury to another person." Neb. Rev. Stat. § 28-308(1) (Reissue 1989).

The statute plainly requires that the prosecution prove, beyond a reasonable doubt, that the defendant caused the victim's death intentionally. In order to support a conviction of second degree murder, the defendant must intend to kill. We have always so held. "The essential elements of second degree murder are that the murder must be done purposely and maliciously." *State v. Dean*, 237 Neb. 65, 73, 464 N.W.2d 782, 788 (1991). Accord *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983).

Defendant's interpretation of the elements of second degree murder is correct. The prosecutor's insistence that the State is not required to prove intent to kill is in error.

The facts before us, however, are sufficient to support a finding of intent to kill. "Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death." *State v. Rokus*, 240 Neb. 613, 622, 483 N.W.2d 149, 155 (1992). See, also, *State v. Bright*, 238 Neb. 348, 470 N.W.2d 181 (1991). Defendant's testimony that he did not intend to kill does not require that the court find such intent did not exist. The court could determine, beyond a reasonable doubt, that defendant had the intent to kill from defendant's act of firing 15 rounds from a 9-mm automatic weapon into an area 3 to 4 feet from where he had just seen a human head.

A trial judge sitting without a jury is not required to articulate findings of fact or conclusions of law in criminal cases. In *State v. Cowan*, 204 Neb. 708, 285 N.W.2d 113 (1979), the defendant argued that the court erred in failing to specifically find whether the defense of justification existed. We stated:

> Even if we assume the evidence raised the issue of justification, it presented simply a factual question for the finder of fact to determine. There is no rule of law which requires the trial judge, acting as the trier of fact in a criminal case, to make any special findings of fact. "In a jury-waived action, the judgment of the trial court on the facts has the same force as a jury verdict and will not be set aside on appeal if there is sufficient competent evidence to support it. A guilty verdict of the fact finder in a criminal case must be sustained if there is substantial evidence, taking the view most favorable to the State, to support it."
>
> . . .
>
> Defendant argues he has no way of knowing if the court considered the matter of justification. It will be presumed in a jury-waived criminal trial that the judge was familiar with and applied the proper rules of law unless it otherwise clearly appears. In any event, the record of the de novo trial in the District Court indicates the matter was considered.

*Cowan*, 204 Neb. at 711, 285 N.W.2d at 115.

In *State v. Lozano*, 209 Neb. 772, 777, 311 N.W.2d 529, 532 (1981), the court stated: "The defendant complains that the

trial court refused to make specific findings of fact and conclusions of law. Neb. Rev. Stat. § 25-1127 (Reissue 1979), upon which the defendant relies, has no application to criminal proceedings."

In this case, we further note that a jury was formally waived by defendant 3 weeks before the trial to the court. No request for specific findings or for "justification" was made until after the court rendered its decision. We see no reason to require reversal of a conviction because the defendant is not satisfied with the prosecutor's understanding of the applicable law.

The trial court's decision that defendant was guilty of second degree murder is supported by the evidence. We will not assume, as defendant requests, that the trial judge was not aware of the elements of second degree murder.

AFFIRMED.

CAPORALE, J., concurring.

I agree with the result reached by the majority only because the requests that the findings of fact and conclusions of law be articulated were not made until after the defendant-appellant, Kevin G. Franklin, had been pronounced guilty. If, however, the majority opinion means that even in the face of a timely request, a trial judge acting as the fact finder need not reveal the factual and legal bases upon which a criminal judgment rests, then the opinion goes too far.

The statement in *State v. Cowan*, 204 Neb. 708, 711, 285 N.W.2d 113, 115 (1979), that "[t]here is no rule of law which requires the trial judge, acting as the trier of fact in a criminal case, to make any special findings of fact" is dictum because no request for such appears to have been made. Admittedly, however, the declaration in *State v. Lozano*, 209 Neb. 772, 311 N.W.2d 529 (1981), that Neb. Rev. Stat. § 25-1127 (Reissue 1979) (requiring that, upon request, a judge sitting as a trier of fact state in writing the conclusions of fact separately from the conclusions of law) does not apply to criminal cases implies that a timely request had been made.

But even if the separation of powers doctrine does not render a statute in this area irrelevant, a matter with which I do not now concern myself, the fact that no statute may require an articulation of the factual and legal bases upon which a criminal

judgment rests does not mean that other considerations do not demand that such be done. As noted in *People v Jackson*, 390 Mich. 621, 212 N.W.2d 918 (1973), findings of fact in a nonjury case serve a function paralleling the judge's charge in a jury case, that of revealing the law applied by the fact finder. Moreover, such findings of fact may be indispensable to a proper appellate review. *United States v. Brown*, 716 F.2d 457 (7th Cir. 1983).

If the rule indeed is that a trial judge acting as a fact finder in a criminal case need never reveal the facts and laws upon which the judgment is founded, a criminal defendant may be well advised not to waive a jury, especially in view of the reality that a circumspect judge cannot be held accountable for the evidential rulings made in such a trial. See, e.g., *State v. Garza ante* p. 256, 487 N.W.2d 551 (1992); *State v. Chambers, ante* p. 66, 486 N.W.2d 481 (1992).