Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2022 08:05 AM CST

STATE OF NEBRASKA, APPELLEE, V.
CHRISTINE E. VANDERFORD, APPELLANT.
___ N.W.2d ___

Filed October 14, 2022.  No. S-20-849.

1. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, because these are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

3. **Statutes.** Statutory analysis begins with the text.

4. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

5. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

6. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of an act are consistent, harmonious, and sensible.

7. **Criminal Law: Statutes.** Penal statutes must be strictly construed and are considered in the context of the object sought to be accomplished,

the evils and mischiefs sought to be remedied, and the purpose sought to be served. A penal statute will not be applied to situations or parties not fairly or clearly within its provisions.

8. ____: ____. To determine the elements of a crime, courts look to the text of the enacting statute.

9. **Criminal Law: Intent: Words and Phrases.** A person commits the crime of exploiting a vulnerable adult under Neb. Rev. Stat. § 28-386 (Reissue 2016) by knowingly and intentionally engaging in an act which causes or permits a "vulnerable adult," as that term is defined in Neb. Rev. Stat. § 28-371 (Reissue 2016), to be subjected to "exploitation," as that term is defined in Neb. Rev. Stat. § 28-358 (Reissue 2016).

10. **Criminal Law: Statutes: Words and Phrases.** Although the statutory definition of exploitation in Neb. Rev. Stat. § 28-358 (Reissue 2016) is broad enough to encompass what might generally be described as financial exploitation, it is by no means limited to only financial crimes.

11. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

12. ____. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

13. **Convictions.** A conviction on one count cannot be overturned merely because it is inconsistent with the fact finder's decision not to convict on another count.

14. **Criminal Law: Trial: Judges.** A trial judge sitting without a jury is not required to articulate findings of fact or conclusions of law in criminal cases.

15. **Trial.** In civil cases, parties may ask a court to make specific findings under Neb. Rev. Stat. § 25-1127 (Reissue 2016), but that statute has no application to criminal proceedings.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellant.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

STACY, J.

Following a bench trial, Christine E. Vanderford was found guilty of exploiting a vulnerable adult, in violation of Neb. Rev. Stat. § 28-386 (Reissue 2016). The district court sentenced her to 5 years' probation. Vanderford appeals, and we affirm.

## I. BACKGROUND

At the time of the events giving rise to the criminal charges in this case, Vanderford was a licensed attorney in Lincoln, Nebraska. On December 5, 2019, she was charged with exploitation of a vulnerable adult (a Class IIIA felony) and theft by deception, $5,000 or more (a Class IIA felony). The State later amended the theft charge to theft by unlawful taking, $5,000 or more (a Class IIA felony).

As relevant to the exploitation charge, the information alleged that Vanderford "on, about, or between July 8, 2014 and February 28, 2018, in the County of Lancaster and State of Nebraska, then and there being, through a knowing and intentional act, did cause or permit a vulnerable adult or senior adult to be exploited." The exploitation charges were based on Vanderford's conduct while serving as a court-appointed coguardian for J.R.K., an adult woman with disabilities, and simultaneously serving as cotrustee of a special needs trust established for J.R.K.'s benefit.

Vanderford entered not guilty pleas and waived her right to a jury trial. A bench trial was held over the course of several days, and both parties adduced evidence. We summarize that evidence in the next section, to the extent necessary to address the assignments of error raised on appeal.

### 1. EVIDENCE ADDUCED AT TRIAL

#### (a) J.R.K.

J.R.K. is an adult woman with mental disabilities. Due to these disabilities, she receives Social Security disability income and qualifies for Medicaid benefits, including vocational and residential services. During the relevant time periods, J.R.K. lived with, and was assisted in her daily activities

by, an "extended family home provider" (EFH), who was paid a daily contract rate by the State of Nebraska. J.R.K. also earned income from working part-time jobs.

### (b) J.R.K.'s Guardianship,
### Conservatorship, and Trusts

In 2006, J.R.K. moved to Nebraska to live with her mother and stepfather (the Krotzes). That same year, the Krotzes hired Vanderford to set up a guardianship and conservatorship for J.R.K., and both were established in the county court for Lancaster County. The Krotzes were appointed to serve as J.R.K.'s coconservators and coguardians.

In 2011, J.R.K.'s biological father died and J.R.K. received an inheritance. The Krotzes hired Vanderford to set up a trust designed to allow J.R.K. to keep her inheritance without losing her government benefits. Vanderford established an "irrevocable supplemental needs trust" for J.R.K.'s benefit, with the Krotzes serving as cotrustees. After the irrevocable supplemental needs trust was established, J.R.K.'s conservatorship was terminated, but the guardianship continued.

About 2 years later, Vanderford assisted the Krotzes in creating a second trust for J.R.K.'s benefit. Vanderford created a "self-settled special needs trust" (SSSNT), and its stated purpose was "to supplement, but not replace any benefits or assistance of any Federal or State governmental entity to which Beneficiary may be eligible or which Beneficiary may be receiving." The Krotzes were named as cotrustees of the SSSNT, and Vanderford was named as alternate successor trustee.

### (c) Vanderford Appointed J.R.K.'s Coguardian
### and Begins Handling J.R.K.'s Finances

In 2014, J.R.K.'s mother died. J.R.K.'s stepfather did not want to handle the guardianship responsibilities alone, and he asked Vanderford to serve as J.R.K.'s coguardian and to assume primary handling of J.R.K.'s financial affairs. Vanderford agreed, but told the stepfather that because she had a solo legal practice, she may need to charge her regular

hourly legal rate for services provided to J.R.K. during business hours. The stepfather agreed to such a billing arrangement, assuming it would be "an infrequent thing," because the EFH was primarily responsible for taking J.R.K. to medical and dental appointments and driving her on excursions during the day. There was no evidence that the guardianship court was made aware of, or approved of, the billing arrangement proposed by Vanderford.

In July 2014, the county court appointed Vanderford to serve as J.R.K.'s coguardian. The letters of guardianship contained the following admonishment in bold and underlined typeface:

> **You shall <u>not</u> pay compensation to yourself or your attorney from assets or income of your ward/incapacitated person . . . without first giving notice to interested persons and obtaining an order of the court. The order may be entered without a hearing if all interested person have waived notice or have executed their written consent to the fee.**

In addition to this admonishment on compensation, the letters of guardianship required Vanderford to file, annually, "a complete accounting of your administration of the ward's . . . money, assets, possessions or income (including social security or other benefits) if you have possession of such."[1]

Several months after Vanderford was appointed as J.R.K.'s coguardian, the SSSNT was amended to make Vanderford a cotrustee. From that point on, Vanderford established a close relationship with J.R.K., who grew to consider Vanderford her "best friend." The record shows the two exchanged hundreds of text messages, went to movies and baseball games together, attended J.R.K.'s therapy and medical appointments together, and went on trips together. Vanderford characterized

---

[1] See Neb. Rev. Stat. § 30-2628(6) (Reissue 2016) ("[a] guardian is required to report the condition of his or her ward and of the estate which has been subject to the guardian's possession or control, at least every year and as required by the court or court rule").

her relationship with J.R.K. as that of "proxy mother" and testified that she was asked to assume such a role by J.R.K.'s mother before she died.[2]

### (d) Vanderford Becomes Cosigner
### on J.R.K.'s Accounts

Before Vanderford began managing J.R.K.'s finances, three accounts had been set up for J.R.K.'s benefit. One account was described as J.R.K.'s guardianship account, another was an investment account associated with the SSSNT, and the third was an account associated with the irrevocable supplemental needs trust. After Vanderford was appointed coguardian and named cotrustee of the SSSNT, she became an authorized cosigner on J.R.K.'s accounts.

In addition, Vanderford opened three new accounts for J.R.K. at the same bank where Vanderford kept her business and personal accounts. One of the new accounts was designated as a guardianship account for J.R.K. and was funded primarily by J.R.K.'s Social Security income. Another account was designated as a "special needs trust" account, although the evidence showed it was operated as an ordinary bank account. The third account was designated as a "debit card account," which J.R.K. was also authorized to use subject to daily spending limits; this account was funded in part by J.R.K.'s wages, gifts, and transfers from other accounts maintained for J.R.K's benefit.

The evidence showed that from November 2015 forward, all of J.R.K.'s accounts—both old and new—were managed primarily by Vanderford. However, when Vanderford filed her annual guardianship accountings in 2016 and 2017, she included only the accounts designated as J.R.K.'s guardianship accounts; Vanderford did not report or provide an accounting for any of the other accounts maintained for J.R.K.'s benefit over which Vanderford had control.

---

[2] Brief for appellant at 7.

### (e) Vanderford's Financial Difficulties

The evidence was undisputed that while Vanderford was serving as coguardian for J.R.K. and as cotrustee of the SSSNT, she was experiencing significant financial problems within her law practice. When the financial problems persisted into 2016, Vanderford hired a business consultant to advise her.

After a review, the consultant identified significant financial issues within the firm. She noted that Vanderford pulled "exorbitant amounts of money out of the business for personal spending without regard to payroll or other overhead." The firm did not have enough money to "make ends meet," and employees' paychecks were "bouncing." According to the consultant, these financial issues stemmed in part from the fact that Vanderford was "constantly distracted," "rarely complete[d] work in a timely manner," and had "no consistent follow through as far as entering time to be billed." It was the consultant's opinion that Vanderford tracked her billable time "by her calendar," "via emails," or just "in her head." After months of working unsuccessfully to correct these financial issues, the consultant terminated the relationship with Vanderford's firm.

### (f) Investigations

In early 2017, the EFH working with J.R.K. became suspicious when she learned that the money in one of J.R.K.'s accounts was being rapidly depleted. The EFH reported her concerns to her supervisor,[3] and an Adult Protective Services investigator was assigned to look into the matter.

The investigator met with J.R.K., after which she reviewed J.R.K.'s guardianship records, bank records, and J.R.K.'s individual service plan at the Department of Health and Human Services. The investigator discovered that Vanderford had been transferring money between J.R.K.'s accounts and making payments to herself out of J.R.K.'s accounts. The guardianship court was notified of the Adult Protective Services

---

[3] See Neb. Rev. Stat. § 28-372 (Reissue 2016) (setting out reporting requirements for suspected abuse, neglect, or exploitation of vulnerable adult).

investigation; eventually, Vanderford and J.R.K.'s stepfather agreed to step down as J.R.K.'s coguardians, and a successor guardian was appointed for J.R.K. in early 2018.

In March 2018, Adult Protective Services completed its investigation and concluded that J.R.K. was being financially exploited by Vanderford. Adult Protective Services turned its findings over to the Lincoln Police Department, and an officer assigned to the department's technical investigations unit looked into the matter further. His investigation revealed that while serving as J.R.K.'s coguardian and cotrustee of the SSSNT, Vanderford made multiple payments to herself out of J.R.K.'s accounts without court approval. Vanderford claimed those payments were meant to compensate her for various legal and personal services she performed for J.R.K. and for various services performed by Vanderford's paralegal. Almost all of the services were billed at Vanderford's hourly legal rate of $215 or at her paralegal's hourly rate. Although the investigator was not able to locate an invoice for every payment to Vanderford, he was able to match up some payments with invoices prepared by Vanderford's law firm.

The invoices in our record show extensive billing by Vanderford for services related to J.R.K. Many of the billing entries were for nonlegal services related to J.R.K.'s personal care and maintenance, including invoices for communicating with J.R.K., accompanying J.R.K. to counseling sessions and medical appointments, and meeting with others regarding J.R.K.'s behaviors, needs, and benefits. Examples of such billings include:

• A charge of $5,805 for 27 hours of work, described on the invoice as:

   [C]ounselor meeting attendance (6 meetings) to help address [J.R.K.'s] behavior issues, doctors appointments (arranging them and attending) including her medical review nurse, Michelle Lemon, and tweaking medication type and dosage, attending IPP meetings (semi and annual, including travel to and back, approximately 2

hours each), working with [J.R.K.'s] EFH's regarding [J.R.K.'s] behaviors . . . , meetings with Richard and/or Richard and EFH to coordinate [J.R.K.'s] needs; interviewing ILC at meeting with ILC to see if [J.R.K.] needs work transferred from Vital

• A charge of $9,083.75 for 42.25 hours of work, described on the invoice as:

[I]nvolvement with email communication regarding [J.R.K.]; 169 Emails not yet invoiced to [J.R.K.] for 2015 and 2016 regarding her care, filing for her Medicaid renewable, taking care of her tax situation, oversight on guardianship paperwork for 2015 - through 9/20/2016

• A charge of $1,935 for 9 hours of work, described on the invoice as:

Preparation of Trip to Florida; take [J.R.K.] to Omaha for TSA PreCheck; take [J.R.K.] again after first trip didn't yield results

• A charge of $1,612.50 for 7.50 hours of work, described on the invoice as:

[T]ravel to get [J.R.K.] to take her to work; travel to get [J.R.K.] to take her to dental appointment that was cancelled, travel to take [J.R.K.] to go to Verizon to buy new phone and spend time getting new phone set up; additional time with [J.R.K.'s] phone at Verizon to straighten out billing issues.

As the above billings suggest, J.R.K. took a trip to Florida in 2017. Vanderford accompanied J.R.K. on that trip, after which she paid herself $4,000 from one of J.R.K.'s accounts. Although no invoice was located for this payment, the memorandum line on the check reads: "Florida $500 day per diem/ 8 days."

When paying these invoices, Vanderford regularly used checks from J.R.K's various accounts and made them out to herself or her law firm. On at least one occasion, Vanderford caused J.R.K.'s account to incur an overdraft fee after writing a check to herself which did not clear. On another occasion,

Vanderford transferred funds from one of J.R.K.'s accounts directly into Vanderford's personal checking account which, prior to the transfer, was overdrawn.

According to the investigator's findings, Vanderford made 16 payments to herself from J.R.K.'s various accounts totaling $65,258.89. The record shows that Vanderford made most, if not all, of these payments to herself without seeking or obtaining prior court approval.

## 2. Verdict

In September 2020, the district court announced its verdict in open court. On count 1, exploitation of a vulnerable adult, the court recited that the State had proved all material elements of the crime beyond a reasonable doubt, and it found Vanderford guilty. In a written verdict entered the same day, the court expressly found the State had proved beyond a reasonable doubt:

> 1. That J.R.K. was a vulnerable adult, and
> 2. That [Vanderford] did cause or permit or subject J.R.K[.], to exploitation, and
> 3. That [Vanderford] did so knowingly and intentionally, and
> 4. That the actions of [Vanderford] took place on or about or between July 8, 2014, and February 28, 2018, in Lancaster County, Nebraska.

The written verdict also stated that the court, in reaching its verdict, used the definition of "[v]ulnerable adult" appearing in Neb. Rev. Stat. § 28-371 (Reissue 2016), the definition of "[s]ubstantial mental impairment" appearing in Neb. Rev. Stat. § 28-369 (Reissue 2016), and the definition of "[e]xploitation" appearing in Neb. Rev. Stat. § 28-358 (Reissue 2016). We address these statutory definitions later in our analysis.

On count 2, theft by unlawful taking in the amount of $5,000 or more, the court found Vanderford not guilty. The court set the matter for sentencing and ordered a presentence investigation.

### 3. Posttrial Motion and Sentencing

Vanderford filed a timely motion for new trial under Neb. Rev. Stat. § 29-2101 (Reissue 2016), asserting, among other things, that her acquittal on the theft charge was inconsistent with her conviction for exploitation and that the evidence was insufficient to support the conviction. The court overruled the motion for new trial and sentenced Vanderford to 5 years' probation. Vanderford filed this timely appeal, represented by trial counsel.

### II. ASSIGNMENTS OF ERROR

Vanderford assigns, reordered and rephrased, that the district court erred in convicting her of exploiting a vulnerable adult, because (1) the definition of exploitation necessarily requires proof of a financial crime and the State failed to prove a financial crime; (2) there was insufficient evidence that it was "wrongful or unauthorized"[4] for Vanderford to pay herself from J.R.K.'s accounts; (3) the State failed to prove that Vanderford acted with sufficient mens rea to support the offense of exploiting a vulnerable adult, because such a conviction cannot be "based upon negligence or a mere breach of a fiduciary duty"; (4) the guilty verdict on count 1 was inconsistent with the acquittal on count 2; (5) sentencing remarks by the court contradict the guilty verdict; and (6) the district court failed to make sufficient conclusions of law when rendering its verdict.

### III. STANDARD OF REVIEW

[1] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.[5] In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or

---

[4] § 28-358.

[5] *State v. Taylor*, 310 Neb. 376, 966 N.W.2d 510 (2021).

reweigh the evidence presented, because these are within a fact finder's province for disposition.[6] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[7]

[2] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[8]

## IV. ANALYSIS

### 1. Proving Exploitation of Vulnerable Adult

Several of Vanderford's arguments on appeal challenge whether the district court correctly identified the material elements that the State needed to prove in order to convict her of the crime of exploiting a vulnerable adult. Her other arguments are generally aimed at challenging the sufficiency of the evidence to support her conviction. To address these arguments, we begin by interpreting the statutes setting forth the material elements of the crime for which Vanderford was convicted— exploitation of a vulnerable adult.

[3-7] Statutory analysis begins with the text.[9] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[10] Similarly, it is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.[11] Components of a series

---

[6] *Id.*

[7] *Id.*

[8] *State v. Chase*, 310 Neb. 160, 964 N.W.2d 254 (2021).

[9] *Taylor, supra* note 5.

[10] *State v. Knight*, 311 Neb. 485, 973 N.W.2d 356 (2022).

[11] *Id.*

or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of an act are consistent, harmonious, and sensible.[12] Penal statutes must be strictly construed and are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.[13] A penal statute will not be applied to situations or parties not fairly or clearly within its provisions.[14]

[8] To determine the elements of a crime, we look to the text of the enacting statute.[15] The crime of exploiting a vulnerable adult is contained within the Adult Protective Services Act (APSA).[16] Determining the elements of that crime requires consideration of several statutes within the APSA.

The APSA criminalizes the knowing and intentional exploitation of a vulnerable adult in § 28-386, which provides, in relevant part:

> (1) A person commits knowing and intentional . . . exploitation of a vulnerable adult or senior adult if he or she through a knowing and intentional act causes or permits a vulnerable adult or senior adult to be:
> . . . .
> (d) Exploited.
> . . . .
> (2) Knowing and intentional . . . exploitation of a vulnerable adult or senior adult is a Class IIIA felony.

For purposes of the APSA, a "[v]ulnerable adult" is defined in § 28-371 as "any person eighteen years of age or older who has a substantial mental or functional impairment or for whom a

---

[12] *State v. Hofmann*, 310 Neb. 609, 967 N.W.2d 435 (2021).

[13] *Id.*

[14] *Id.*

[15] *State v. Grutell*, 305 Neb. 843, 943 N.W.2d 258 (2020).

[16] See Neb. Rev. Stat. §§ 28-348 to 28-387 (Reissue 2016 & Cum. Supp. 2020).

guardian or conservator has been appointed under the Nebraska Probate Code."

The term "exploitation" for purposes of the APSA is defined in § 28-358. When the APSA was first enacted in 1988, exploitation was defined as "the taking of property of a vulnerable adult by means of undue influence, breach of a fiduciary relationship, deception, or extortion or by any unlawful means."[17] Effective July 19, 2012, the Legislature amended the definition of "exploitation" to mean "the taking of property of a vulnerable adult *by any person* by means of undue influence, breach of a fiduciary relationship, deception, or extortion or by any unlawful means."[18] And in 2016, the statutory definition of "exploitation" was amended again.[19] It currently provides:

> Exploitation means the wrongful or unauthorized taking, withholding, appropriation, conversion, control, or use of money, funds, securities, assets, or any other property of a vulnerable adult or senior adult by any person by means of undue influence, breach of a fiduciary relationship, deception, extortion, intimidation, force or threat of force, isolation, or any unlawful means or by the breach of a fiduciary duty by the guardian, conservator, agent under a power of attorney, trustee, or any other fiduciary of a vulnerable adult or senior adult.[20]

This expanded definition of exploitation has been in effect since April 19, 2016. We note that the information charging Vanderford with intentional or knowing exploitation of a vulnerable adult alleged a timeframe from July 8, 2014, through February 28, 2018, so both the 2012 and the 2016 statutory definitions of exploitation are potentially relevant.

---

[17] See 1988 Neb. Laws, L.B. 463, § 11, codified at § 28-358 (Reissue 1995).

[18] See 2012 Neb. Laws, L.B. 1051, § 6 (emphasis supplied), codified at § 28-358 (Cum. Supp. 2012).

[19] See 2016 Neb. Laws, L.B. 934, § 4, codified at § 28-358 (Reissue 2016).

[20] § 28-358.

[9] Reading §§ 28-386, 28-371, and 28-358 together, it is clear that a person commits the crime of exploiting a vulnerable adult by knowingly and intentionally engaging in an act which causes or permits a "vulnerable adult," as that term is defined in § 28-371, to be subjected to "exploitation," as that term is defined in § 28-358.

In this appeal, Vanderford asserts that to prove the elements of exploitation of a vulnerable adult, the State must necessarily prove "a financial crime against a vulnerable adult."[21] More specifically, Vanderford asserts that "[t]he offense of exploitation is a financial crime, that requires [proof of] an underlying theft or wrongful or [un]authorized taking."[22] She argues that the court erred in failing to find the same. Vanderford does not explain what, precisely, she means by a "financial crime," but regardless, we think her argument oversimplifies the current statutory scheme.

The current definition of "exploitation" lists six proscribed acts: the wrongful or unauthorized "taking," "withholding," "appropriation," "conversion," "control," or "use" of property belonging to the vulnerable adult or senior adult. And it describes five categories of property: "money," "funds," "securities," "assets," or "any other property of a vulnerable adult or senior adult." Most of these categories can fairly be characterized as financial in nature, but the catchall category of "any other property" is broad enough to encompass both real property and personal property. Finally, the definition of exploitation lists the means by which the proscribed acts must be accomplished by the perpetrator, and those means are not restricted to financial scenarios. Rather, the possible means include: "undue influence," "breach of a fiduciary relationship," "deception," "extortion," "intimidation," "force or threat of force," "isolation," "any unlawful means," or by "the breach of a fiduciary duty by the guardian, conservator, agent under a

---

[21] Brief for appellant at 12.

[22] *Id.* at 8.

power of attorney, trustee, or any other fiduciary of a vulnerable adult or senior adult."

[10] As such, under the current definition of "exploitation," there are a myriad of different ways to commit the crime of exploiting a vulnerable adult. And although the statutory definition of exploitation in § 28-358 is broad enough to encompass what might generally be described as financial exploitation, it is by no means limited to only financial crimes. We therefore reject, as impermissibly narrow, Vanderford's contention that proving the crime of exploitation necessarily requires proof of a financial crime.

We likewise reject Vanderford's suggestion that the district court erred when it recited the material elements of exploitation of a vulnerable adult. With respect to count 1, the court recited in its written verdict that the State had the burden to prove each of the following elements beyond a reasonable doubt: (1) that J.R.K. was a vulnerable adult as defined in §§ 28-371 and 28-369; (2) that Vanderford knowingly and intentionally caused or permitted J.R.K. to be exploited as defined in § 28-358; and (3) that Vanderford did so on, about, or between the dates of July 8, 2014, and February 28, 2018, in Lancaster County. We find that the court's order correctly recited the material elements which the State was required to prove beyond a reasonable doubt on the charge of exploitation of a vulnerable adult.

With these material elements in mind, and considering the evidence in the light most favorable to the State, we next consider whether the evidence was insufficient to convict Vanderford of exploiting a vulnerable adult.

Most of the pertinent evidence was undisputed. Vanderford does not dispute that J.R.K. is a vulnerable adult. She admits that "there was a fiduciary relationship between Vanderford and J.R.K.," and she admits that she owed J.R.K. a fiduciary duty as her court-appointed coguardian and as cotrustee of the SSSNT established for J.R.K.'s benefit during the relevant

timeframe.[23] She also admits that during the relevant time period, she billed J.R.K. for personal services at the hourly rate she used for legal work, and then paid herself from J.R.K.'s accounts without requesting or obtaining approval from the guardianship court.

The letters of guardianship, as well as the order appointing Vanderford to serve as coguardian, expressly prohibited Vanderford from paying compensation to herself from J.R.K.'s assets or income without first obtaining an order of the court. The evidence showed that Vanderford regularly disregarded this requirement. She knowingly and intentionally used her position as coguardian and cotrustee to repeatedly compensate herself from accounts established for J.R.K. over which she had control, and she did so without seeking or obtaining court approval. And despite managing multiple accounts containing J.R.K's money, assets, and income, Vanderford did not provide the guardianship court with a complete accounting of her administration of those accounts. Whether or not Vanderford was deliberately attempting to hide her conduct from the guardianship court, this improper exercise of power was wrongful and unauthorized under the letters of guardianship, as well as the order appointing Vanderford to serve as coguardian, and resulted in a breach of the fiduciary duty Vanderford owed to J.R.K. as her court-appointed guardian.

As such, a rational trier of fact could have found that Vanderford's knowing and intentional conduct in compensating herself from J.R.K.'s accounts, without obtaining prior court approval, caused or permitted J.R.K. to be exploited as that term is defined in § 28-358. The evidence supports the conclusion that Vanderford's intentional conduct resulted in the wrongful or unauthorized taking, appropriation, conversion, or use of J.R.K.'s money, funds, or assets, and that Vanderford did so either by means of the breach of a fiduciary relationship or by the breach of a fiduciary duty as J.R.K.'s guardian.

---

[23] See brief for appellant at 22.

And, for the sake of completeness, we note that the evidence is sufficient under both the current definition of exploitation in § 28-358 and the definition in effect before the 2016 amendments.

[11] The State also argues that Vanderford committed other wrongful and unauthorized acts which amounted to exploitation of a vulnerable adult. But ultimately, we need not address those arguments. We have already determined that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,[24] and it is unnecessary to discuss all the possible ways in which the evidence might support a finding of exploitation. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[25]

## 2. Vanderford's Arguments Challenging Sufficiency of Evidence

Vanderford presents four arguments challenging the sufficiency of the evidence to support her conviction for exploiting a vulnerable adult. We address each argument in turn and find all to be meritless.

### (a) Consent of J.R.K.'s Stepfather

First, Vanderford argues the evidence does not support a finding that her conduct was "wrongful or unauthorized." She points to evidence that J.R.K.'s stepfather and coguardian agreed early on that Vanderford could charge her regular hourly legal rate for providing guardianship services and that he "was aware of and approved of what Vanderford was doing."[26]

[12] Vanderford's brief also broadly states that "[t]he evidence established that [she] was permitted or authorized by the

---

[24] See *Taylor, supra* note 5.

[25] *Gonzales v. Nebraska Pediatric Practice*, 308 Neb. 571, 955 N.W.2d 696 (2021).

[26] Brief for appellant at 14.

Trust instruments to pay herself for legal services and for personal services she provided to J.R.K."[27] But Vanderford neither describes nor explains which trust terms she is relying on for this statement.[28] Nor does she present any argument explaining how or why the trust instruments in this case authorized her to compensate herself from J.R.K.'s assets without seeking prior approval from the guardianship court. Because an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court,[29] we do not consider Vanderford's unsupported assertion that the trust instruments authorized her conduct.

Further, we soundly reject Vanderford's suggestion that the coguardian's apparent knowledge and tacit approval of her conduct in compensating herself from J.R.K.'s accounts without obtaining prior court approval has any bearing on whether her conduct was wrongful and unauthorized. It is undisputed that during the entire time Vanderford was paying herself from J.R.K.'s assets, she was serving as J.R.K.'s court-appointed guardian and was subject to the express admonishment that **"You shall <u>not</u> pay compensation to yourself or your attorney from assets or income of your ward/incapacitated person . . . without first . . . obtaining an order of the court."** This admonition could not have been more clear, and it contained no exceptions. Absent court approval, Vanderford's conduct in paying herself from J.R.K.'s assets was wrongful and unauthorized, and the coguardian's tacit approval of such conduct is immaterial. Her argument in this regard is meritless.

---

[27] *Id.* at 13.

[28] See Neb. Ct. R. App. P. § 2-109(D)(1)(g) (rev. 2022) ("[e]ach and every recitation of fact, whether in the statement of facts or elsewhere in the brief, shall be annotated to the record in the manner set forth in § 2-109(C)").

[29] *State v. Malone*, 308 Neb. 929, 957 N.W.2d 892 (2021), *modified on denial of rehearing* 309 Neb. 399, 959 N.W.2d 818.

### (b) Acquittal on Theft Charge

Next, Vanderford argues that her acquittal on the charge of theft by unlawful taking in the amount of $5,000 or more compels the conclusion that the evidence was insufficient to convict her of exploitation of a vulnerable adult. She contends the verdicts are inconsistent and "do not square with each other, nor with the facts of the case."[30] There are two problems with her argument.

First, the statutory elements to prove theft by unlawful taking are not the same as the elements to prove exploitation of a vulnerable adult.[31] The crimes are separate and distinct.[32] Vanderford's acquittal on the theft charge does not suggest the evidence was somehow insufficient to convict her of the exploitation charge.

[13] Moreover, a conviction on one count cannot be overturned merely because it is inconsistent with the fact finder's decision not to convict on another count.[33] Vanderford cannot successfully challenge her conviction for exploitation of a vulnerable adult by arguing that it is inconsistent with the court's decision to acquit her of theft by unlawful taking in the amount of $5,000 or more.

### (c) Mens Rea

Vanderford also argues that the State failed to prove she acted with sufficient mens rea or criminal intent to support the felony offense of exploiting a vulnerable adult. As we understand her argument, she does not dispute that her conduct amounted to a breach of duty, but she argues that "for a breach

---

[30] Brief for appellant at 14.

[31] Compare Neb. Rev. Stat. § 28-511 (Reissue 2016) (statute defining theft by unlawful taking) with §§ 28-386 and 28-358 (statutes defining exploitation of vulnerable adult).

[32] See, e.g., *State v. Dehning*, 296 Neb. 537, 894 N.W.2d 331 (2017) (defendant convicted of theft by unlawful taking and exploiting vulnerable adult arising from same set of facts).

[33] See *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

of [fiduciary] duty to be criminal, the breach must be more than an act of simple negligence."[34] In other words, she claims that "§§28-386 and [28-]358 cannot be interpreted to punish a simple breach of fiduciary duty (negligence) as a felony."[35]

But § 28-386 does not punish a simple breach of fiduciary duty. It criminalizes a "knowing and intentional act [that] causes or permits a vulnerable adult or senior adult to be . . . exploited."[36] The breach of fiduciary relationship or duty is not the required mens rea for the crime; it is just one of several means by which to accomplish a "wrongful or unauthorized taking, withholding, appropriation, conversion, control, or use of money, funds, securities, assets, or any other property" of a vulnerable adult or senior adult, and thus satisfy the definition of "exploitation" under § 28-358.

Here, the evidence was sufficient to show beyond a reasonable doubt that Vanderford's knowing and intentional conduct in compensating herself from J.R.K.'s accounts, without obtaining prior court approval, caused or permitted J.R.K. to be exploited as that term is defined in § 28-358. There is no merit to Vanderford's suggestion that the State failed to prove the requisite criminal intent to convict her of exploiting a vulnerable adult.

(d) Judge's Sentencing Remarks

Vanderford asserts that remarks made by the trial court during sentencing contradict or undermine the written guilty verdict and require that the conviction be vacated. Before addressing this assertion, we summarize the pertinent sentencing remarks.

After hearing allocution, but before imposing sentence, the judge recounted some of the evidence presented at trial. In doing so, the judge highlighted the evidence regarding the reporting failures, accounting irregularities, billing irregularities, and

---

[34] Brief for appellant at 22.

[35] *Id.* at 21.

[36] § 28-386.

overdraft fees. He then said to Vanderford, "[Y]ou were at a time in your life, I believe, where you weren't running your law practice as one might have expected. I think that's just so clear." The judge then said, "[O]verall, I don't believe that there was the kind of financial exploitation — meaning, money wrongfully taken from the trust [—] that maybe the State does," adding, "I don't think it is possible to go through the pennies and figure [it] out."

Relying on these statements, Vanderford now argues that her conviction should be vacated because "the Court's own words at sentencing established that the Court was clearly wrong"[37] in finding her guilty of exploiting a vulnerable adult. We disagree.

We see nothing about the court's sentencing remarks, understood in context, which contradicts, undermines, or calls into doubt its prior verdict finding that Vanderford was guilty of exploiting a vulnerable adult. We do not understand the court's remarks to suggest it was equivocating on that conviction in any way. Rather, it appears the court was merely noting that it did not necessarily agree with the State's position regarding the total sum of money that was wrongfully taken by Vanderford while serving as J.R.K.'s guardian. Such an observation may have been intended to explain why the court thought a sentence of probation was appropriate for the Class IIIA felony offense, or it may have been intended as an explanation for why Vanderford was acquitted on the theft charge. Either way, the statement had no impact on the conviction for exploiting a vulnerable adult. We reject Vanderford's claim that the sentencing remarks provide a basis to challenge the conviction.

### 3. SPECIFIC CONCLUSIONS OF LAW

Vanderford's final argument on appeal is that the district court "erred in failing to make sufficient conclusions of law to support its guilty verdict." Before addressing Vanderford's argument, we provide some additional background.

---

[37] Brief for appellant at 21.

(a) Additional Facts

At the pretrial hearing during which Vanderford waived her right to jury trial, Vanderford's counsel brought up what he described at the time as "proposals" for waiving jury under which the court would "make some particular findings, mostly conclusions of law." The State expressed no objection to defense counsel's proposal, and after some additional discussion with counsel, the court indicated it was willing to issue a written order "specify[ing] the material elements of the offenses . . . like a jury instruction would set out the material elements of the offense." After this discussion, Vanderford waived her right to jury trial, confirming on the record that she understood her right to a jury trial, that she had conferred with her counsel regarding that right, and that she was waiving that right freely and voluntarily. The court accepted Vanderford's waiver and set the matter for a bench trial.

(b) Vanderford's Argument

On appeal, Vanderford assigns that the court erred by "failing to make sufficient conclusions of law to support its guilty verdict as required by the express conditions of [Vanderford's] jury waiver." During oral argument before this court, Vanderford's counsel described Vanderford's jury waiver as "conditional" and argued that if the court had not been willing to make specific written conclusions of law, Vanderford would "never have waived jury." As we will explain, this assignment of error has no merit.

We begin by rejecting Vanderford's suggestion that her jury waiver decision was expressly conditioned on the court's agreement to make written conclusions of law. Vanderford states that she "contemplated a jury waiver to focus on the legal issues as to . . . the essential elements of the exploitation offense and what *mens rea* or criminal intent element had to be proven as to that charge."[38] We understand this to suggest that Vanderford and her counsel thought there would be a tactical

---

[38] *Id.* at 15.

advantage to trying the case to the court because, unlike a jury verdict, the court may be willing to make specific findings of fact and conclusions of law that could help Vanderford focus the issues on appeal. But we see nothing in the record suggesting that Vanderford's jury waiver was in any way conditional.

Despite Vanderford's characterization, we are aware of no statute or case law in Nebraska authorizing a defendant to make a "conditional jury waiver" or authorizing a court to accept one. But we see plenty of reasons for trial courts to be especially cautious about making any statement or agreement that might be perceived as inducing a defendant to waive a constitutional right.

In *People v. Collins*,[39] for example, the California Supreme Court found that a criminal defendant's waiver of the right to jury trial was invalid because, prior to accepting the waiver, the trial court had informed the defendant that he would receive some unspecified benefit if he waived a jury trial. On appeal, the defendant argued the trial court's statement amounted to an improper inducement to waive the right to jury, and the California Supreme Court agreed. It reasoned that "after having been advised by the trial court that he *would* receive some benefit of an undetermined nature to be determined by the court at a later time, the defendant no longer could be said to have voluntarily relinquished his right to jury trial."[40] Thus, even though the waiver colloquy was otherwise proper and thorough, the trial court was found to have "acted in a manner that was at odds with its judicial obligation to remain neutral

---

[39] *People v. Collins*, 26 Cal. 4th 297, 27 P.3d 726, 109 Cal. Rptr. 2d 836 (2001). See, also, 6 Wayne R. LaFave et al., Criminal Procedure § 22.1(h) at 41-42 (4th ed. 2015) ("[s]ometimes a 'jury waiver agreement,' expressly assuring the defendant of certain punishment concessions . . . is unobjectionable so long as the negotiations were with the prosecutor rather than the trial judge").

[40] *Collins, supra* note 39, 26 Cal. 4th at 311, 27 P.3d at 736, 109 Cal. Rptr. 2d at 847.

and detached in evaluating the voluntariness of the waiver,"[41] and the defendant's conviction was reversed.

Notably, Vanderford has not assigned or argued that her decision to waive jury was improperly induced or should be deemed invalid. But even if she had, we see nothing in the record suggesting that the court did, or said, anything to induce Vanderford to waive her right to a jury trial or acted in a manner inconsistent with its judicial obligation to remain neutral and detached in evaluating the voluntariness of any jury waiver. To the contrary, it was Vanderford's counsel who first asked whether the court would make written conclusions of law. After clarifying the nature of defense counsel's request and confirming the State had no objection, the court agreed to make written conclusions of law, which it had discretion to do.

The crux of Vanderford's argument is not that there was something improper about the court's willingness to make written conclusions of law, but, rather, that the court's conclusions were insufficient. We disagree. As we read the trial court's written verdict, it made all of the findings and conclusions of law requested by the defense and discussed by the parties during the pretrial hearing. It identified the material elements of the charge on which Vanderford was convicted, and it made an express finding that the State had proved each material element beyond a reasonable doubt. To the extent Vanderford complains on appeal that the written verdict did not "define the proper *mens rea* element of that offense" or "explain the Court's interpretation of the statute," her arguments are simply not supported by the record.[42]

[14,15] More important, we question whether the failure to make factual findings and conclusions of law could ever result in reversible error in a case such as this. Although criminal trial courts have discretion to make specific findings of fact

---

[41] *Id.* at 309, 27 P.3d at 734, 109 Cal. Rptr. 2d at 845.

[42] See brief for appellant at 16.

and conclusions of law in criminal cases tried to the bench, the law does not compel it. In Nebraska, a trial judge sitting without a jury is not required to articulate findings of fact or conclusions of law in criminal cases.[43] In civil cases, parties may ask a court to make specific findings under Neb. Rev. Stat. § 25-1127 (Reissue 2016), but we have been clear that § 25-1127 has "'no application to criminal proceedings.'"[44] So, although defendants are free to ask courts to make specific findings or conclusions of law in criminal bench trials, they are not entitled to compel such findings or conclusions as a matter of law, because they are discretionary. So even if the trial court's conclusions of law were not as detailed as Vanderford would have liked, that does not provide a basis for reversible error.

## V. CONCLUSION

The State proved beyond a reasonable doubt that Vanderford, while serving as a court-appointed guardian for a vulnerable adult, knowingly and intentionally caused her ward to be exploited in violation of § 28-386. Finding no merit to any of the assignments of error raised on appeal, we affirm the judgment of the district court.

AFFIRMED.

---

[43] *State v. Franklin*, 241 Neb. 579, 489 N.W.2d 552 (1992). See, also, *State v. Cowan*, 204 Neb. 708, 711, 285 N.W.2d 113, 115 (1979) ("[t]here is no rule of law which requires the trial judge, acting as the trier of fact in a criminal case, to make any special findings of fact").

[44] *Franklin, supra* note 43, 241 Neb. at 587, 489 N.W.2d at 557, quoting *State v. Lozano*, 209 Neb. 772, 311 N.W.2d 529 (1981). See, also, *State v. Dake*, 247 Neb. 579, 582, 529 N.W.2d 46, 48 (1995) (explaining that § 25-1127 "does not apply to criminal cases").